[No. S016628. Crim. No. 25000. June 27, 1996.]

In re TROY LEE JONES on Habeas Corpus.

**COUNSEL**

Richard L. Phillips and Charles M. Bonneau, under appointments by the Supreme Court, for Petitioner.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Robert R. Anderson, Assistant Attorney General, Ward A. Campbell, W. Scott Thorpe and Clayton S. Tanaka, Deputy Attorneys General, for Respondent.

## OPINION

**GEORGE, C. J.**—While his appeal from a judgment imposing the death penalty was pending before this court, petitioner Troy Lee Jones filed the petition for writ of habeas corpus that gave rise to the present proceeding. The petition, in part reiterating petitioner's contentions on appeal, alleged that numerous failings by his trial attorney, Hugh Wesley Goodwin (defense counsel), deprived petitioner of his right to the effective assistance of counsel. Concluding that the petition stated a prima facie claim for relief, we issued an order to show cause returnable before this court.

For the reasons discussed hereafter, we conclude that defense counsel's performance before and during the guilt phase of the trial was marked by numerous deficiencies, and that the cumulative impact of counsel's short-comings at that phase of the proceedings was prejudicial with regard to the judgment of guilt. Petitioner, therefore, is entitled to habeas corpus relief, and the judgment must be set aside in its entirety.

I.

The factual and procedural background of petitioner's conviction and sentence of death is set forth fully in the companion opinion in *People v. Jones* (1996) 13 Cal.4th 535, and briefly is summarized here: The body of the victim, Carolyn Grayson, was found on December 23, 1981, 62 miles from her Fresno residence, lying in an alfalfa field near Los Banos in Merced County. Grayson's keys, including keys that fit petitioner's vehicle, were found near the murder scene. The prosecution's theory of the case was that petitioner fatally shot Grayson on December 23, or the previous evening, in order to prevent her from contacting law enforcement authorities regarding petitioner's involvement in the strangulation murder of Grayson's neighbor, Janet Benner, approximately 11 months earlier.

Among the allegations set forth by petitioner in the habeas corpus petition are that he was deprived of the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, because his trial attorney provided deficient representation in numerous respects, including: (1) counsel's failure to

conduct an adequate investigation prior to the guilt phase of the trial, and (2) counsel's failure to seek exclusion of irrelevant and prejudicial evidence. Subsumed within each one of these general allegations are a number of discrete contentions, the most compelling of which will be addressed in this opinion.

After reviewing the habeas corpus petition, we determined that it stated a prima facie case for relief, and issued an order to show cause that did not limit the issues the court would consider. Upon the filing of a return and a traverse, we determined there were several disputed factual issues requiring an evidentiary hearing with respect to petitioner's claim of ineffective assistance of counsel.[1] We therefore appointed the Honorable William T. Ivey, Judge of the Merced County Superior Court, as a referee to take evidence and make findings on the following questions:

"1. Did defense counsel have a reasonable tactical basis for his failure to seek exclusion of prosecution evidence that defendant possess[ed] two .38 [caliber] handguns in January and February of 1981?"

"2. What actions did defense counsel take to prepare for the penalty trial in this case?"

"3. What reasons, if any, did defense counsel have for not taking further steps to prepare for the penalty trial?"

"4. What additional actions, if any, would reasonably competent counsel take to prepare for the penalty trial?"

"5. What additional mitigating evidence, if any, would have been discovered by reasonably competent counsel in preparing for the penalty trial?"

Judge Ivey conducted an evidentiary hearing that spanned eight days in the autumn of 1992, heard arguments of counsel on April 28, 1993, and submitted a report with extensive factual findings on May 3, 1993.[2]

Based upon our review of the trial record in this matter, the evidentiary proceedings before Judge Ivey and his findings, and the voluminous briefing

---

[1] Attached to respondent Attorney General's return to order to show cause was a declaration submitted by Clayton Tanaka, a deputy attorney general, explaining that, in an effort to obtain defense counsel's declaration, he attempted to contact defense counsel on more than 20 occasions during a 6-month period. Defense counsel repeatedly evaded Tanaka's requests, eventually submitting a four-page declaration one month after respondent filed the return.

[2] The parties filed their exceptions to the referee's report over the ensuing few months. Shortly thereafter, Richard Phillips, one of petitioner's attorneys on appeal, suffered a fatal heart attack, and we appointed his cocounsel, Charles Bonneau, to take over the responsibility of representing petitioner in these proceedings.

submitted by the parties to this court (15 separate briefs, spanning the 10-year period since the petition was filed), we conclude that petitioner's claim of ineffective assistance of counsel at the guilt phase of the proceedings has merit and that the judgment must be set aside in its entirety. Accordingly, we need not, and do not, reach petitioner's claims related to the penalty phase.

## II.

The legal principles relevant to petitioner's claim are well settled. "To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)" (*In re Neely* (1993) 6 Cal.4th 901, 908-909 [26 Cal.Rptr.2d 203, 864 P.2d 474].)

Our review of counsel's performance is a deferential one. (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370].) "It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694-695, 104 S.Ct. 2052].) "However, 'deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. "[D]eference is not abdication" [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions.' " (*In re Cordero, supra,* 46 Cal.3d at p. 180, quoting *People* v. *Ledesma* (1987) 43 Cal.3d

171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].) "Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance." (*People* v. *Ledesma, supra*, 43 Cal.3d at p. 217.)

Applying this standard, we review seriatim certain allegations submitted by petitioner that defense counsel's preparation for and performance during the guilt phase of the trial were so deficient as to constitute ineffective assistance of counsel, and that such deficient performance, viewed in its entirety, was prejudicial under the applicable *Strickland* standard.

### A. Allegations of ineffective assistance of counsel at the guilt phase

#### 1. Trial counsel's investigation and preparation for trial

##### a. The handgun evidence

Petitioner contends that defense counsel failed to conduct an adequate investigation prior to the commencement of the guilt phase, with the result that the jury heard irrelevant evidence establishing that petitioner possessed handguns and was involved in an illegal drug transaction that escalated into an armed confrontation. Petitioner further contends that, as a result of defense counsel's inadequate investigation, the jury did not hear evidence that would have contradicted a critical portion of the prosecution's case. Respondent contends that defense counsel's preparation for trial was not constitutionally deficient.

On January 15, 1982, petitioner was charged with the murder of Carolyn Grayson. The preliminary hearing, at which petitioner was represented by a contract public defender for the County of Merced, was conducted on February 19, 22, and 23, 1982. At some point after the preliminary hearing was completed, and prior to petitioner's arraignment in superior court on March 11, 1982, petitioner's mother, Margaret Payne, retained Hugh Wesley Goodwin, a sole practitioner, as defense counsel. Goodwin agreed to represent petitioner at trial for the sum of $7,500. Because Payne was unable to pay this sum at the time she retained Goodwin, he agreed to accept monthly payments; according to Payne's testimony, given at the evidentiary hearing, these payments totaled "over $5,000." Goodwin could not recall whether petitioner's case constituted counsel's first capital trial under California's 1978 death penalty law.[3]

Petitioner spoke with Goodwin for the first time on March 11, 1982, the date petitioner was arraigned in superior court. Their four pretrial conversations, in the eighty-two-day period between arraignment and trial, lasted a

---

[3]At the evidentiary hearing, Goodwin testified ambiguously as to whether petitioner's case was the first capital case he had tried under California's 1978 death penalty law. When asked whether he could identify the names of any capital cases he had handled prior to petitioner's

total of three to four hours. During one of these conversations, defense counsel showed petitioner a copy of a police report indicating that petitioner had pawned and redeemed two .38-caliber handguns in January and February 1981 at Federal Jewelry and Loan, located in Fresno. Defense counsel stated that law enforcement officials believed that either one, or both, of the firearms had been used to kill Grayson. Petitioner explained to defense counsel that one of these weapons, an R.G. Model 40 (the Model 40) had been confiscated (and never returned) by the Fresno police in the course of their investigation of a March 1981 incident involving petitioner's armed confrontation with a seller of cocaine. Petitioner further explained that the other weapon, an Arminius Titan Tiger (the Titan) was in the possession of petitioner's father, Richard Jones. Petitioner informed defense counsel that neither weapon had been used in the Grayson killing, and that firearms comparison tests would so demonstrate.

Notwithstanding this knowledge, defense counsel did not speak with Richard Jones prior to trial or obtain the Titan from him, nor did defense counsel obtain a copy of the police report describing the circumstances that led to the confiscation of the Model 40. Defense counsel did not retain an investigator, nor did he request funds for investigators and experts as permitted by Penal Code section 987.9. Indeed, the referee found that defense counsel "*never thought about*" whether, as retained counsel, he had access to investigative funds pursuant to Penal Code section 987.9, despite counsel's knowledge that such investigatory funds were available under the statute. (Italics added.) Defense counsel did speak on three or four occasions with Ray Brown, an investigator hired by the Merced County Public Defender to assist petitioner's codefendant, Emanuel Corners (whose case was severed from petitioner's, and ultimately was dismissed after the proceedings against petitioner were concluded); defense counsel, however, never asked Brown to speak with Richard Jones or to obtain the firearm from him. Defense counsel did not have the Model 40 or the Titan tested prior to trial. He did not file a motion *in limine* seeking exclusion of evidence of either weapon, or exclusion of evidence of petitioner's use of an alias in pawning the weapons. In fact, during the eighty-two-day period between petitioner's arraignment and trial, defense counsel filed just one motion: seven days before the trial was set to begin, defense counsel filed a motion for continuance in order to have psychiatric and polygraph examinations performed on three prosecution witnesses, and to permit counsel to attend a hearing in an unrelated murder case being heard in Fresno. The motion was denied.

In his petition for writ of habeas corpus, petitioner contends that, as a result of defense counsel's cursory preparation for trial, the jury heard

---

trial, Goodwin testified he could not recall. He added that he had been unable to locate his file in petitioner's case, and explained that his practice as to destroying files "is to get rid of them as soon as I can."

irrelevant evidence that petitioner possessed firearms and was involved in an illegal drug transaction that evolved into an armed confrontation. Respondent contends that defense counsel's investigation was adequate, because it was consistent with a tactical decision by the defense to attempt to "sandbag" the prosecution at trial by allowing evidence relating to petitioner's possession of handguns to be admitted, creating an opportunity for defense counsel to demonstrate late in the trial that none of the handguns connected to petitioner could have been the murder weapon.

At the evidentiary hearing, defense counsel testified that, prior to trial, he knew the prosecution possessed evidence establishing that petitioner had pawned two .38-caliber handguns early in 1981. Based upon his discussions with petitioner and petitioner's family, defense counsel believed that one of these firearms had been seized by the Fresno Police Department in March 1981, and the other had been in the possession of petitioner's father, leading defense counsel to conclude that neither firearm had been used to kill Carolyn Grayson. Notwithstanding this conclusion, defense counsel testified that he did not wish to have evidence of these firearms excluded from the trial. In his view, the firearms were "a big thing that I saw in [petitioner's] case that was in his favor that might have some bearing on his being acquitted. . . . [b]ecause the jury, prosecution, investigators were all of the belief that the guns, that one of the two guns would be involved or was involved in the crime." Defense counsel further testified he "didn't see any negative aspects" to allowing the firearms to be entered into evidence, "didn't waste much time debating about it," and did not believe that a courtroom display of the weapons would give the jury an unfavorable impression of petitioner. Defense counsel anticipated that the prosecution would attempt to use the weapons to portray petitioner unfavorably, but "[i]t was my opinion that [petitioner] had everything to gain and nothing to lose."[4]

Although we agree with respondent's contention that defense counsel's minimal investigation prior to trial was *consistent* with counsel's strategy of "sandbagging" the prosecution with regard to the handgun evidence, we do not believe that that circumstance *excused* defense counsel's clearly inadequate pretrial investigation. ■ Past decisions establish that the reasonableness of a tactical decision at trial invites scrutiny as to whether that

---

[4]Defense counsel's testimony regarding his decision not to seek exclusion of the firearms evidence was consistent with his declaration (attached to respondent's return to the order to show cause), in which he stated: "It was obvious from the atmosphere of the courtroom that Troy Jones was going to have to affirmatively establish that he was innocent. With the conversations that had taken place between family members and in the presence of Troy Jones and the extent of his participation in those conversations, I took the position that we desperately needed something. It seemed that everything focused on the gun and it appeared that the [prosecution's] impression was that the gun that was involved was the gun that we had located (in Richard Jones' possession)."

decision was an informed one, that is, whether it was preceded by adequate investigation and preparation. (See, e.g., *Strickland* v. *Washington, supra,* 466 U.S. at pp. 690-691 [80 L.Ed.2d at p. 695] ["[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."]; see also *In re Marquez* (1992) 1 Cal.4th 584, 602 [3 Cal.Rptr.2d 727, 822 P.2d 435] ["[B]efore counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation."]; *In re Fields* (1990) 51 Cal.3d 1063, 1069 [275 Cal.Rptr. 384, 800 P.2d 862] [same]; *People* v. *Ledesma, supra,* 43 Cal.3d at p. 215 [same]; *In re Hall* (1981) 30 Cal.3d 408, 426 [179 Cal.Rptr. 223, 637 P.2d 690] [" '[W]hile acknowledging the wide latitude and discretion necessarily vested in trial counsel in the area of tactics and strategy, we stress that the exercise of that discretion must be a reasonable and informed one in the light of the facts and options reasonably apparent to counsel at the time of trial, and founded upon reasonable investigation and preparation.' "]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587] [same].)

▪ With the foregoing principles in mind, the record before us demonstrates that defense counsel's pretrial investigation at best was perfunctory, marked by a few conversations with petitioner and apparently little else. Defense counsel did not seek pretrial investigative funds as permitted by Penal Code section 987.9, did not retain the services of a licensed investigator, and made only minimal use of the investigator who was working on behalf of petitioner's codefendant, Emanuel Corners.[5] Although the amount of time available to defense counsel to prepare for trial was relatively brief, 82 days (and, as a solo practitioner, he was responsible for handling other cases during this period, including preparation for a murder trial scheduled to commence 13 days after the date set for petitioner's trial), defense counsel failed to request a continuance in the present case until 1

---

[5]On the eighth day of trial (one day before the parties concluded presenting their respective cases), defense counsel submitted a belated request to the court for $300 in investigative fees to locate and interview witnesses. The request was unaccompanied by any points and authorities, and on that basis was denied by the trial court (without prejudice, pending submission of supporting points and authorities). Defense counsel did not renew the motion at trial.

week prior to trial when, without citation of any authority, he sought to have petitioner's trial continued. The request was denied.

A criminal defendant is entitled to "a reasonably competent attorney acting as a diligent, conscientious advocate." (*People* v. *Pope* (1979) 23 Cal.3d 412, 424 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Although, as noted, trial counsel must be accorded wide latitude and discretion regarding trial tactics and strategy, "the exercise of that discretion must be a reasonable *and informed one* in light of the facts and options reasonably apparent to counsel at the time of trial, *and founded upon reasonable investigation and preparation.*" (*People* v. *Frierson*, *supra*, 25 Cal.3d at p. 166, italics added.) Because "[r]epresentation of an accused murderer is a mammoth responsibility" (*In re Hall*, *supra*, 30 Cal.3d at p. 434), the "seriousness of the charges against the defendant is a factor that must be considered in assessing counsel's performance." (*Profitt* v. *Wainwright* (11th Cir. 1982) 685 F.2d 1227, 1247.)

Measured against these standards, defense counsel's pro forma investigation prior to trial clearly was inadequate for a complicated capital trial. As we have made clear in our past decisions, the constitutional right to be represented by counsel embodies a right to be represented by a "diligent, conscientious advocate." (*People* v. *Pope*, *supra*, 23 Cal.3d at p. 424.) Defense counsel's investigation prior to trial did not meet this standard. Even if defense counsel believed the best trial strategy was to "sandbag" the prosecution with regard to the handgun evidence, we believe that reasonably competent counsel would have investigated thoroughly all the evidence pertaining to petitioner's prior involvement with these weapons, to ensure that the benefits of such a trial strategy were likely to outweigh the disadvantages of that course, and to be prepared at trial to limit the amount of irrelevant, prejudicial evidence that was admitted as a result of the planned trial strategy. Defense counsel failed to perform these tasks. For this reason, we agree with petitioner's contention that defense counsel's pretrial investigation and preparation for trial were inadequate.

b. *The witness not located*

Petitioner contends that defense counsel's inadequate preparation resulted in the jury not hearing evidence that would have contradicted an important aspect of the prosecution's case. Specifically, petitioner argues that in view of the testimony of petitioner's brother, Marlow Jones, given at the preliminary hearing (and read at trial), in which Marlow stated that Carolyn Grayson had informed him of petitioner's involvement in the murder of Janet Benner, defense counsel thereafter should have located and

subpoenaed Linda Henderson, who allegedly would have testified at trial that, while incarcerated with Grayson in March 1981, Grayson told her that Benner had been killed by someone named Roy Lee Davis. The return to the order to show cause, filed by respondent, does not address this contention.

We agree that defense counsel performed deficiently in failing to investigate the information Linda Henderson furnished to the police. The Fresno police report, detailing the information provided by Henderson to officers investigating the murder of Janet Benner, revealed that Henderson believed Carolyn Grayson had spoken truthfully in implicating Roy Lee Davis in the murder of Janet Benner. Although the record is unclear as to when defense counsel initially learned of the existence of the police report, he obviously was aware of it by the time the defense called Fresno Police Officer Charles Mitchell to testify at trial as to its contents. At that juncture, defense counsel sought to overcome the effect of not having Linda Henderson available to testify by asking Mitchell on direct examination regarding this aspect of the police investigation into Benner's murder. Because the prosecution successfully interposed objections on hearsay grounds, defense counsel was unable to elicit testimony from Mitchell recounting the substance of what Henderson had told him.

At the evidentiary hearing, defense counsel acknowledged *that he did not attempt to locate* Linda Henderson, *and provided no reason for not doing so*, prompting the referee to observe: "[Defense counsel] is sure he did not try to find Linda Henderson. And if assuming that [Henderson] had some information that would have suggested that [petitioner] had no reason to kill Miss Grayson, . . . that would seem to be something that [defense counsel] could have presented to the jury to show a lack of motive on [petitioner's] part." We agree with the referee's observation that Henderson conceivably could have offered testimony helpful to the defense. Henderson's information, given to the police nine months prior to Carolyn Grayson's murder and indicating Grayson had implicated someone other than petitioner in the murder of Janet Benner, was relevant to the witness-murder special circumstance. In our view, reasonably competent defense counsel, having been placed on notice that a witness in a capital case had contacted the police prior to commission of the charged offense, offering information that was pertinent to the special circumstance ultimately charged against the defendant, would have attempted to locate such a witness.

2. *Defense counsel's errors in eliciting damaging evidence on cross-examination of a prosecution witness, and failure to interpose objections to prejudicial evidence*

Petitioner contends that defense counsel committed numerous errors at trial, leading to the improper introduction of prejudicial evidence. As we

shall explain, we conclude that petitioner has demonstrated numerous deficiencies in defense counsel's performance at trial.

a. *Defense counsel's performance in eliciting prejudicial hearsay from the victim's eight-year-old daughter*

■ The prosecution introduced the testimony of Carolyn Grayson's daughter, Sauda Smith, who was eight years of age at the time of petitioner's trial. On direct examination, Sauda testified inconsistently in response to the prosecutor's inquiry, "Did your mother tell you who killed Janet [Benner]?" Initially, Sauda replied, "Yeah," but when the question was posed to her a second time, after the trial court overruled defense counsel's hearsay objection, Sauda replied, "No." The prosecutor did not inquire further into this issue.

On cross-examination, the following colloquy ensued.

Defense counsel: "When was it that your mother talked to you about Troy Jones?"

Sauda Smith: "I don't know."

Defense counsel: "You don't know?"

Sauda Smith: "No."

Defense counsel: "Do you know how it was the subject came up?"

Sauda Smith: "No."

Defense counsel: "What did she say about Troy Jones?"

Prosecutor: "I am going to ask that he be a little more specific with the conversation."

Trial court: "Sustained."

Defense counsel: "Do you remember the conversation that you had with your mother about Troy Jones?"

Sauda Smith: "Yeah."

Defense counsel: "Tell me what that conversation was."

Sauda Smith: "My mother—my mother says that Troy had killed—killed Janet. And she didn't tell me nothing else."

Thereafter, defense counsel moved unsuccessfully to strike Sauda's testimony.

Petitioner contends that defense counsel rendered ineffective assistance of counsel in eliciting Sauda's testimony regarding the foregoing conversation. Respondent contends that in view of Sauda's contradictory responses given on direct examination, "it was impossible to predict" what responses she thereafter would provide when questioned on cross-examination by defense counsel.

In his declaration (executed under penalty of perjury), appended to respondent's return to order to show cause, defense counsel does not refer to the contradictions in Sauda's testimony, instead explaining: "Knowing that Carolyn Grayson had supposedly named another [person as the perpetrator in the murder of Janet Benner, i.e., Roy Lee Davis] *and believing that among the jurors that this was an accepted fact,* I saw a possibility that had Sauda Smith (Carolyn's daughter) responded with the other name the defendant would have at least a chance." (Italics added.)

In reply, petitioner contends that "there is no basis in the record to explain how the jury would have reached this conclusion [that Carolyn Grayson had identified someone other than petitioner as Janet Benner's killer] at that point in the trial . . . ." Eleven prosecution witnesses testified prior to Sauda Smith; none of those witnesses, nor Sauda, testified as to any such statement made by Grayson. If we were to accept petitioner's interpretation of defense counsel's declaration—i.e., that defense counsel was stating that the jurors had accepted as a fact that Grayson had named someone other than petitioner as Janet Benner's killer—then petitioner is correct that, at the relatively early point in petitioner's trial when Sauda testified, the record contained no evidence upon which to base such an assertion. Not until the defense presented its case-in-chief did defense counsel, through the testimony of Fresno Police Officer Charles Mitchell, attempt to place that information before the jury.

There exists, however, an alternate interpretation of defense counsel's declaration. In pertinent part, that declaration states: "The evidence showed that the family never discouraged what was being proposed but joined in conversations with Troy Jones about ways of promoting Carolyn Grayson's death and that things had progressed to a point where death seemed the only answer. Knowing that Carolyn Grayson had supposedly named another, and believing that among the jurors that *this* was an accepted fact, I saw a possibility that had Sauda Smith (Carolyn's daughter) responded with the other name the defendant would have at least a chance." (Italics added.)

Conceivably, defense counsel's declaration, in exceedingly inartful and confusing fashion, relied upon the italicized word "this" to signify that he believed that, at the time Sauda testified at trial, the jury already was convinced that *petitioner had murdered Janet Benner*, and therefore defense counsel believed he had nothing to lose by asking Sauda whether her mother ever had identified another person as the perpetrator of that crime. This interpretation of the declaration arguably is supported by the circumstance that, prior to Sauda giving her testimony, the jury already had heard testimony that petitioner, using an alias, had pawned Benner's adding machine on a date that corresponded to the estimated date of her death, and that petitioner had attacked Grayson while Grayson cowered beneath a truck, screaming, "I won't hurt you, Troy, I won't do anything to hurt you, Troy, leave me alone, I won't say anything." This interpretation also is supported by defense counsel's additional explanation (set forth in his declaration appended to respondent's return): "In deliberating and agonizing over whether or not to put the question to the little girl Sauda, *I didn't see any more harm considering what was already in the record* but saw only great benefits if for some reason her answer may have been different." (Italics added.)

We need not decide which interpretation of defense counsel's poorly drafted declaration offers the more plausible view, because under either interpretation, it is clear that defense counsel made a conscious, strategic decision to ask Sauda to name the person her mother had identified as the murderer of Janet Benner. Our task is to determine whether defense counsel's decision to pose that question fell below the standard of a reasonably competent attorney. For the following reasons, we believe that it did.

First, defense counsel failed to indicate whether he had attempted to interview Sauda before trial to determine what her answer to that question might be. In the absence of any such indication, we assume that defense counsel did not attempt to do so, a view supported by defense counsel's statement that he "deliberat[ed] and agoniz[ed] over whether or not to put the question to the little girl Sauda."

Second, defense counsel should have been aware that, as set forth in one of the police reports generated following the murder of Carolyn Grayson, Sauda had informed the police that her mother had told her that petitioner had killed Janet Benner. Thus, even if defense counsel's question to Sauda somehow were to yield the fortuitous response of her naming someone other than petitioner, the "great benefits" defense counsel sought to realize from such testimony likely would have been illusory, because such testimony merely would have opened the door for the prosecution to introduce Sauda's prior inconsistent statement. (Evid. Code, § 1235.)

Third, the manner in which defense counsel posed his questions in cross-examining Sauda made it unlikely that Sauda would have responded by testifying that her mother identified someone other than petitioner as Benner's murderer. Indeed, rather than ask Sauda to repeat the name of the person identified by her mother as Benner's murderer, defense counsel asked: "Do you remember the conversation that you had with your mother *about Troy Jones?*" [Answer] "Yeah." [Question] "Tell me what that conversation was." [Answer] "My mother—my mother says that Troy had killed—killed Janet. And she didn't tell me nothing else." (Italics added.)

In view of the foregoing considerations, it is difficult to discern a reasonable tactical basis for defense counsel's action in eliciting Sauda's highly prejudicial testimony. Defense counsel appeared to recognize the devastating nature of Sauda's testimony in response to his questioning, as evidenced by his subsequent, unsuccessful motion to strike that testimony. On these facts, we conclude that defense counsel's decision to risk eliciting highly prejudicial hearsay evidence from Sauda was an unreasonable one.

b. *Failure to object properly to prejudicial evidence*

(1) *Emanuel Corners's extrajudicial statements to Marlow Jones*

On direct examination during the defense's case, petitioner testified that he was with Emanuel Corners on the evening Carolyn Grayson was murdered. In rebuttal, over objections interposed by defense counsel (described below), the prosecution introduced the testimony of Marlow Jones, given at the joint preliminary hearing of petitioner and Corners, wherein Marlow stated that shortly after Grayson's death Corners told him: " 'I helped him carry the bitch in the field,' but he didn't say no names." Marlow further testified that Corners added: " 'I should have threw the gun in the lake instead of the pond.' " Pursuant to objections interposed by petitioner's appointed counsel at the preliminary hearing, these statements were introduced at the preliminary hearing against Corners only, and not against petitioner.

In introducing the foregoing testimony on rebuttal at petitioner's trial, the prosecution relied upon the theory that both Marlow and Corners were "unavailable" as witnesses (Evid. Code, § 1291, subd. (a)): Marlow was unavailable because he did not appear when the prosecution proposed to call him on rebuttal at trial, and Corners because he had asserted his privilege under the Fifth Amendment to the United States Constitution as a basis for refusing to testify at petitioner's trial. (Evid. Code, § 240; *People* v. *Malone* (1988) 47 Cal.3d 1, 23 [252 Cal.Rptr. 525, 762 P.2d 1249].) The prosecution

also asserted that Corners's statements constituted declarations against his penal interest. (Evid. Code, § 1230.) Defense counsel unsuccessfully objected to introduction of Marlow's testimony on the grounds that Marlow was not unavailable, that the prosecution had failed to establish a connection between Corners's statements and petitioner, and that Corners's statements did not refer explicitly to Carolyn Grayson. The trial court overruled these objections and refused defense counsel's additional request that, if these statements were to be admitted, the court instruct the jury that the statements were applicable only as to Corners and not to petitioner.

In the present proceeding, we need not, and do not, consider the issue whether the trial court abused its discretion in declaring Marlow unavailable as a witness, and whether any such error by the court, which led to the admission of Marlow's preliminary hearing testimony during the prosecution's case-in-rebuttal, was prejudicial. It is appropriate, however, that we consider the merits of defendant's contention that defense counsel's performance was constitutionally deficient.

 In his petition for writ of habeas corpus, petitioner contends defense counsel rendered ineffective assistance at trial in failing to argue that, because Marlow's testimony given at the preliminary hearing was admitted against Corners only, petitioner lacked "the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing," and thus, that the statement was inadmissible under Evidence Code section 1291, subdivision (a), the provision governing the admission of prior testimony.[6] Specifically, petitioner contends that, because Marlow's preliminary hearing testimony as to Corners's statements was admitted against Corners only, petitioner "had neither an interest nor a motive to cross-examine Marlow at the preliminary hearing with respect to Corners's statements."

We agree with petitioner's contention that, pursuant to Evidence Code section 1291, subdivision (a), reasonably competent counsel would have objected to the introduction of Marlow's preliminary hearing testimony regarding Corners's statements on the ground that at the preliminary hearing petitioner did not have the right and opportunity to cross-examine Marlow, with regard to this portion of his testimony, with an interest and motive

---

[6]Evidence Code section 1291, subdivision (a) provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion or against the successor in interest of such person; or [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

similar to that which petitioner had at trial. Because Marlow's testimony on this point was admitted at the preliminary hearing against Corners only, petitioner's attorney at that hearing reasonably could have been led to decline to conduct any cross-examination of Marlow whatsoever with regard to Corners's statement, or at least less vigorously than he otherwise might have done. Defendant's counsel at the preliminary hearing justifiably could rely upon the circumstance that the limited admission of this statement against only Corners would preclude the subsequent use of this portion of Marlow's testimony against petitioner. In our view, competent trial counsel, having reviewed the transcript of the preliminary hearing, would have brought this limitation to the attention of the trial court at the appropriate juncture.

(2) *Failure to object to evidence that petitioner was involved in an armed confrontation stemming from a cocaine transaction in March of 1981*

■ Petitioner contends that defense counsel provided ineffective assistance in failing to seek the exclusion of evidence indicating he had been involved in an armed confrontation related to a cocaine transaction in March of 1981, and further, that such evidence was unduly prejudicial because it connected petitioner to criminal drug activity and provided the basis for the prosecution to introduce into evidence handguns recovered by the police from the apartment where the confrontation took place. Petitioner contends that, in view of the highly prejudicial nature of the testimony connecting him to cocaine and to several handguns in addition to those he had pawned, competent counsel would have sought timely exclusion of this evidence. As we explain, we agree with petitioner's contention that defense counsel performed deficiently in failing to object to the evidence relating to the incident.

The evidence pertaining to the armed confrontation with a seller of cocaine was introduced immediately after petitioner testified, on recross-examination, that he was unsure as to which handgun he had pawned twice, and which handgun he had pawned once. Defense counsel, on redirect examination, thereafter engaged petitioner in the following colloquy:

Defense counsel: "Which officer has the gun identified as belonging to Frisco?"

Petitioner: "It's the Fresno Police Department, the city."

Defense counsel: "Do you know which officer?"

Petitioner: "No, because like I take Frisco gun back to him to get my money. *What happened was the disturbance before I got there* and—" (italics added).

Defense counsel: "But officers were there."

Petitioner: "Yes, the officers was there."

Defense counsel: "And took your gun."

Petitioner: "Yes."

Defense counsel: "Do you know which officers were there?"

Petitioner: "No, I don't. But it was the police report and everything made on it, because like the D.A. summoned me about it, three days."

On re-cross-examination, and without objection from defense counsel, the prosecutor sought to impeach petitioner regarding the "disturbance" mentioned by petitioner on direct examination, an incident that culminated in the police confiscating the Model 40 handgun pawned by petitioner and redeemed in February 1981:

Prosecutor: "You went there about a disturbance."

Petitioner: "No. I didn't. I said there was a disturbance made prior to me arriving."

Prosecutor: "As a matter of fact, when you went there it was to complain about some cocaine that you had purchased; isn't that true?"

Petitioner: "No, sir."

Prosecutor: "You didn't tell the police that?"

Petitioner: "No, sir. He wanted to give me some cocaine instead of my money."

Prosecutor: "You didn't tell the police anything about it being that you had gotten some bad cocaine—"

Petitioner: "No."

Prosecutor: "—and that is why you went there?"

Petitioner: "No, sir."

Later that day, while the defense was presenting its case, the prosecutor obtained the trial court's permission to call a rebuttal witness out of order for the purpose of further impeaching petitioner's testimony regarding the cocaine transaction. Neil Manha, a police detective employed by the City of Fresno, testified (over a materiality objection interposed by defense counsel) that on March 8, 1981, petitioner "had participated in a drug deal . . . at Frisco's apartment and that he had purchased some cocaine valued at $300 on the street, and that he had used some of the cocaine and found it was very impotent and he had actually snorted some of the cocaine in his nostrils, that he didn't get high, and as a result of this he believed that the cocaine he had bought from [Frisco] was not good at all, and he was upset and wanted his money back." Detective Manha further testified that the police recovered three weapons at the scene of the disturbance, that Manha took a statement that the Model 40 had been in petitioner's possession, and that Manha had brought these weapons to court.

Detective Manha's testimony thereafter led to the following exchange:

Prosecutor: "Could I have these weapons marked as People's next, Your Honor."

Defense counsel: "Well—"

The court: "46, 47 and 48."

Defense counsel: "I object to any weapon other than—I object to all of these weapons coming in. I don't know—"

The court: "Overruled."

Defense counsel: "I don't know what the materiality of it is."

The court: "Well, I have heard all kinds of testimony from your client, Mr. Goodwin, of weapons going in and out of pawn shops, back and forth."

Defense counsel: "There were only two weapons that went in."

The court: "I don't know. [¶] So we're going to find out. [¶] Overruled."[7]

After the firearms were marked as People's exhibits No. 46, 47, and 48, the prosecutor requested that Detective Manha describe them for the jury.

---

[7]At this point, defense counsel requested to see a copy of the police report of the incident. Upon obtaining the report and informing the court that this was the "[f]irst time I saw it,"

Manha testified that exhibit No. 46 was an R.G. brand .38-caliber five-shot revolver, exhibit No. 47 was a Colt brand semiautomatic .22-caliber handgun, and exhibit No. 48 was an RG-40, six-shot .38-caliber revolver (the Model 40). Manha testified further that all three weapons were loaded when they were recovered, and that exhibit No. 48 had been recovered from petitioner's possession. On cross-examination, Manha explained that exhibit No. 46 had been found lying on a couch in Frisco's apartment, exhibit No. 47 had been retrieved from the top of a pile of dishes on a kitchen table at that location, and exhibit No. 48 had been handed to Manha by an acquaintance of Frisco at the same location. Contradicting his own testimony on direct examination, Manha acknowledged that "no weapons were found on Mr. Jones."

The defense called John Hamman, the California Department of Justice criminalist who had testified for the prosecution regarding the types of firearm that might have fired the bullets recovered at the scene of Carolyn Grayson's murder. Hamman testified that, although he had been provided with the bullets in this case to examine, he had not received any firearms with which to conduct comparison tests. Defense counsel then asked Hamman to examine the four handguns that had been marked for identification: People's exhibit No. 46, the R.G. brand model 31, .38-caliber five-shot revolver; exhibit No. 47, the Colt brand .22-caliber semiautomatic pistol; exhibit No. 48, the Model 40, a .38-caliber six-shot revolver; and defense exhibit B, the Arminius .38-caliber Titan Tiger revolver. Hamman testified that exhibit No. 47 could be eliminated immediately as the weapon that fired the bullets found at the murder scene, because it was a .22-caliber weapon and, thus, was incapable of firing the .38-caliber bullet shells recovered at that location. Defense counsel requested that the trial court order Hamman to compare the remaining three firearms—People's exhibits No. 46 and 48 and defense exhibit B—with the shells that had been recovered. The court ordered Hamman to do so, and Hamman contacted the court later in the day, stating that he was unable to establish a connection between the three weapons that he had examined and the shells. The court, having informed counsel outside the jury's presence that it would convey the contents of Hamman's message to the jury, thereafter did so. Defense counsel did not request, and the court did not provide, any explanation or instruction to the jury indicating that Hamman's message had the force of evidence.

As noted, petitioner contends defense counsel performed deficiently in failing to seek the timely exclusion of evidence pertaining to the cocaine transaction and armed confrontation with Frisco and the ensuing confiscation of weapons by the police. Petitioner further contends that defense

---

defense counsel requested (and the trial court granted) a brief recess to permit counsel to read the report prior to cross-examining Detective Manha.

counsel's deficient performance as to this issue was the direct and foreseeable result of defense counsel's inadequate pretrial preparation.

There is merit in petitioner's contention regarding the inadequacy of defense counsel's investigation of the incident involving petitioner's armed confrontation with Frisco. Although, as noted, one of the handguns pawned by petitioner in early 1981, the Model 40, was confiscated by the Fresno police in March of that year, defense counsel made no pretrial effort to obtain the police report or other information regarding that incident. The report contained matter that competent counsel likely would have found useful, such as the arresting officer's acknowledgment that he "was unable to determine which subject [petitioner or Frisco] was telling the truth," as well as evidence indicating that petitioner had not confronted Frisco alone, but with an acquaintance, and that upon meeting the two men, *Frisco* brandished a loaded .38-caliber revolver and another weapon *at them.* Defense counsel's failure to investigate the incident adequately and obtain a copy of this report suggests that prior to trial, while developing his trial strategy, defense counsel was unable to evaluate the manner in which he might use the report to his client's advantage, and was further precluded from fully considering the prejudicial impact of the details of the report, such as petitioner's purchase of cocaine, his angry confrontation with the seller, and his presence in an apartment where loaded firearms were casually strewn atop kitchen dishes and upon a living room couch.

Thus, the circumstance that defense counsel "didn't see any negative aspects" to the introduction of the handgun evidence, and his conclusion that petitioner "had everything to gain and nothing to lose," not only ignored the potentially devastating impact such evidence might have upon the jury (see *People* v. *Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1], overruled on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]), but was due, at least in part, to defense counsel's own failure to conduct an adequate pretrial investigation. Because defense counsel never investigated the full extent of the prosecution's evidence regarding the drug-related circumstances surrounding the confiscation of the Model 40 by the Fresno police, defense counsel could not have considered fully the prejudicial impact of allowing the prosecution to introduce evidence that petitioner, in early 1981, possessed and pawned cheap handguns, one of which was recovered from the apartment of a cocaine dealer. (See also *People* v. *Cardenas* (1982) 31 Cal.3d 897, 907 [184 Cal.Rptr. 165, 647 P.2d 569] [noting the "catastrophic" impact of narcotics evidence upon a jury]; *People* v. *Davis* (1965) 233 Cal.App.2d 156, 161 [43 Cal.Rptr. 357] [same, and observing that the general public "has been taught to loathe those who have anything to do with illegal narcotics in any form or

to any extent"].) Defense counsel's "tactical" decision not to object to evidence associating petitioner with a seller of cocaine, under circumstances involving one or more firearms, clearly was a poorly informed one.

Respondent contends that petitioner himself "opened the door" to the introduction of this evidence with his testimony regarding "the disturbance before I got there," and moreover that defense counsel had reasons, based upon trial tactics, for not interposing an objection to the cross-examination of petitioner on this point.

We agree with petitioner's contention that his brief and very general reference to "the disturbance before I got there" was insufficient to open the door to the introduction of evidence relating to an armed confrontation unrelated to the murder of Carolyn Grayson. (Evid. Code, § 763; *People* v. *Schader* (1969) 71 Cal.2d 761, 770 [80 Cal.Rptr. 1, 457 P.2d 841]; cf. *People* v. *Blair* (1979) 25 Cal.3d 640, 664 [159 Cal.Rptr. 818, 602 P.2d 738].) Accordingly, we conclude that pursuant to a motion *in limine*, or upon proper objection made pursuant to Evidence Code section 350, defense counsel would have succeeded in excluding all reference to the cocaine transaction and armed confrontation, and that defense counsel's handling of the evidence pertaining to petitioner's involvement in the cocaine incident was deficient.

### 3. *Evidence that petitioner shot his mother-in-law*

Petitioner testified on direct examination that he never had owned a handgun, and that his involvement with such weapons was limited to pawning and redeeming handguns that belonged to others. On cross-examination, the prosecutor—without objection from defense counsel—engaged petitioner in the following colloquy:

Prosecutor: "You never possessed a gun, other than the times you've gone to pawn a gun for someone else?"

Petitioner: "I told you, I—I—I owned a shotgun."

Prosecutor: "But never a handgun?"

Petitioner: "No."

Prosecutor: "As a matter of fact, you shot somebody with a handgun one time, didn't you?"

Petitioner: "No."

Prosecutor: "You didn't shoot your mother-in-law Marjorie Scott?"

Petitioner: "No, I have never shot anybody."

The next day, the defense introduced testimony from petitioner's mother-in-law, Marjorie Scott, but did not inquire as to the shooting incident involving petitioner. On cross-examination, the prosecutor engaged Scott in the following colloquy:

Prosecutor: "You are the mother of Emanuel Corners; is that right?"

Marjorie Scott: "That is right."

Prosecutor: "Troy Jones ever shoot you?"

Marjorie Scott: "Yes."[8]

Prosecutor: "Troy Jones ever shoot you?"

Marjorie Scott: "At the time, I didn't remember how it happened. At the time me and my husband were into an argument."

Prosecutor: "Can you answer the question yes or no?"

Marjorie Scott: "Well, yes."

Prosecutor: "He did shoot you."

Marjorie Scott: "Uh-huh."

Prosecutor: "No further questions."

On redirect examination, Marjorie Scott testified that the shooting incident occurred while she and her husband were drinking and arguing, that petitioner had tried to calm and separate the disputants, and as he was doing so, the weapon discharged. On recross-examination—without objection by defense counsel—the following colloquy ensued:

Prosecutor: "Whose gun was it?"

Marjorie Scott: "I really don't know."

---

[8] At this point, defense counsel interposed a relevancy objection. The prosecutor argued that petitioner "said he never possessed a gun, and then he said he never shot anybody." The trial court overruled the objection.

Prosecutor: "You didn't see where the gun came from."

Marjorie Scott: "No."

Prosecutor: "Troy Jones had it when he shot you."

Marjorie Scott: "Undoubtedly he did."

Prosecutor: "And you reported that to the police."

Marjorie Scott: "Yes."

Prosecutor: "And he was arrested."

Marjorie Scott: "No. Because at the time just the way the accident happened, I really don't remember how it happened, because I really was heavily under alcohol, which is why I am a recovering alcoholic now."

Prosecutor: "You were shot where, in the face?"

Marjorie Scott: "Right here, in the jaw."

Prosecutor: "No further questions."

At the evidentiary hearing held in the habeas corpus proceedings, defense counsel testified that he had considered making a motion *in limine* to exclude evidence of the incident in which petitioner shot Marjorie Scott but had decided against it, explaining: "My belief is and it's been my own experience that the more things that come in the better."

Later in the evidentiary hearing, Marshall Banks testified that he was the person engaged in the argument with Scott that led to the shooting, and that in the midst of a loud quarrel with Scott he slapped her, leading *her* to brandish a firearm. Banks explained that, in response to the argument, petitioner came downstairs and asked Scott to put down the gun, "and she refused to put it down, and he was going to take the gun to keep her from using it. . . . He grabbed her arm—well, they were between me and they was tussling with the gun and the gun went off." Banks further testified that no attorney or investigator connected with petitioner's case ever contacted him regarding the incident, and if someone had, he would have furnished the information he provided at the evidentiary hearing and would have testified at petitioner's trial.

 Petitioner contends that defense counsel performed deficiently in failing to investigate the incident adequately and in failing to interpose an

objection to the prosecution's evidence related to the shooting incident. (See *People* v. *Thompson* (1980) 27 Cal.3d 303, 314 [165 Cal.Rptr. 289, 611 P.2d 883] [admission of any evidence that involves crimes other than those for which a defendant is being tried has a " 'highly inflammatory and prejudicial effect' on the trier of fact"].) He contends that when the prosecution introduced the subject in its cross-examination of petitioner, defense counsel either should have moved for the exclusion of the evidence based upon the accidental circumstances of the shooting (if defense counsel was aware of the circumstances at that time), or moved for a continuance in order to allow defense counsel an opportunity to investigate the details of the incident prior to the prosecution's introduction of this evidence before the jury. Although defense counsel was not asked at the evidentiary hearing whether, prior to the prosecution's reference to the incident at trial, he was aware of the details of the incident involving the shooting of Scott, the record of the evidentiary hearing suggests he had some familiarity with the incident; as noted, defense counsel testified that he considered moving *in limine* to exclude evidence of the incident but decided not to do so.

Respondent contends that defense counsel did not render ineffective assistance of counsel and, in the alternative, contends that even if defense counsel did perform deficiently, petitioner suffered no prejudice because Scott testified that the incident was an "accident," she did not recall the details at trial, and petitioner was not arrested in the aftermath of the incident.

We agree with petitioner's contention that defense counsel's handling of this incident fell below the standard of a reasonably competent attorney. Although a Fresno police report, dated February 18, 1981, summarizing the law enforcement investigation following the murder of Janet Benner, indicated that petitioner was a suspect in that investigation *and noted his prior arrest in connection with the Scott incident*, defense counsel did not make a motion *in limine* seeking exclusion of evidence related to this incident. As noted, at the evidentiary hearing defense counsel testified as to the basis for this tactical decision, explaining: "My belief is and it's been my own experience that *the more things that come in the better*." (Italics added.) No reasoned tactical basis appears, however, for having allowed the prosecution to introduce evidence of petitioner's involvement in a shooting incident that resulted in injury to another individual, unrelated to the present case.

One of the principal tasks of a defense attorney is to attempt to protect his or her client from the admission of evidence that is more prejudicial than probative, and that obligation clearly applies to efforts made by the prosecution to introduce evidence of prior crimes or acts of violence

alleged to have been committed by a defendant, when such crimes are unrelated to the charged offense. "In order to render reasonably competent assistance, a criminal defense attorney should investigate carefully the possible grounds for seeking the suppression of incriminating evidence, explore the factual bases for defenses that may be available to the defendant, and otherwise pursue diligently those leads indicating the existence of evidence favorable to the defense. [Citations.]" (*In re Neely, supra,* 6 Cal.4th at p. 919.) An important part of defense counsel's job is to seek exclusion of evidence that is critical to the prosecution's case or that is highly prejudicial. (*People* v. *Ledesma, supra,* 43 Cal.3d at p. 224; *People* v. *Nation* (1980) 26 Cal.3d 169, 179-182 [161 Cal.Rptr. 299, 604 P.2d 1051].) Although we have not held that a defense attorney is *required* to investigate every potentially helpful lead or seek the suppression of every bit of potentially incriminating evidence, in recognition of the circumstance that legitimate tactical reasons may exist for performing the defense function in another manner, we believe that competent counsel, prior to trial, would have investigated more thoroughly the incident involving Scott, in order to make reasonably informed tactical decisions pertaining to the exclusion of irrelevant, potentially damaging evidence. Competent trial counsel would have recognized that, because petitioner was on trial for murdering a close acquaintance, and the critical issue was the identity of the perpetrator, considerable danger loomed in permitting the jury to hear evidence that petitioner had been involved in the shooting of a family member on a prior occasion. (See *People* v. *Rist* (1976) 16 Cal.3d 211, 219 [127 Cal.Rptr. 457, 545 P.2d 833] [admission of evidence of prior crime might cause jurors to conclude that if the defendant committed the prior crime, he likely committed the charged crime as well].)

We believe reasonably competent counsel would have objected to the prosecution's introduction of the shooting incident, or at least would have requested a continuance for the purpose of investigating the circumstances surrounding the shooting, when the prosecution referred to the incident in cross-examining petitioner. Defense counsel failed to interpose such an objection, however, and failed to present evidence that Scott—not petitioner—had brandished the firearm.

The evidence presented at the evidentiary hearing demonstrates that if defense counsel had performed a reasonable investigation—either prior to trial or when the prosecution raised the issue during trial—defense counsel would have learned important details of the incident and would have had a principled basis pursuant to Evidence Code section 352 for arguing that evidence of the shooting should have been excluded. In view of the accidental nature of the shooting and the circumstance that (contrary to the prosecution's suggestion) the evidence did not demonstrate that petitioner possessed or intentionally used a firearm during the incident, defense counsel

might well have been able to argue persuasively that the potentially prejudicial effect of any reference to this incident outweighed whatever minimal probative value such evidence might have had in strengthening the prosecution's case.

Thus, we conclude that defense counsel's actions in failing to object to the introduction of the evidence of the shooting incident fell below the reasonable standard of competency.

### B. *Cumulative effect of error*

■ Petitioner contends that, "[t]hroughout this entire proceeding, [defense counsel], through ignorance of the law and inadequate investigation, failed to present favorable evidence, [and] failed to exclude highly prejudicial evidence . . . . Beyond any question, petitioner was prejudiced by these shortcomings. Therefore, this Court should grant this petition for writ of habeas corpus and vacate petitioner's conviction." Petitioner's position thus embodies the contention that the shortcomings referred to were prejudicial both individually *and* cumulatively; that is, that the effect of defense counsel's deficiencies in representing petitioner, both prior to and during the guilt phase of the trial, viewed as a whole, was to deprive petitioner of his constitutional right to a fair trial. (*In re Sixto* (1989) 48 Cal.3d 1247, 1264-1266 [259 Cal.Rptr. 491, 774 P.2d 164]; *In re Cordero, supra,* 46 Cal.3d 161, 180; see also *People* v. *Ledesma, supra,* 43 Cal.3d 171, 191-227 [cumulative error held to be prejudicial in habeas corpus proceedings consolidated with the defendant's appeal].)

In examining whether the cumulative effect of defense counsel's errors at the guilt phase of the trial undermines our confidence in the outcome under the standard set forth in *Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d 674, 697-698], our analysis is framed by those specific contentions, related to petitioner's claim that his defense counsel rendered ineffective assistance at trial, that we have determined to be meritorious. Those contentions are that defense counsel: (1) inadequately investigated the case prior to the start of trial, notably with regard to the firearms evidence that the prosecution planned to introduce at trial, and with regard to the failure to attempt to locate Linda Henderson, who allegedly would have testified that, while incarcerated with Carolyn Grayson in March 1981, Grayson told her that Janet Benner had been killed by someone named Roy Lee Davis; (2) elicited damaging hearsay testimony from Carolyn Grayson's daughter, Sauda Smith, to the effect that Grayson had informed Sauda that petitioner had killed Janet Benner; (3) failed at trial to object properly to the introduction of Marlow Jones's testimony, given at the preliminary hearing, that had

been admitted against petitioner's codefendant only; (4) failed to seek the exclusion of evidence pertaining to petitioner's armed confrontation with a seller of cocaine in March 1981; and (5) failed to object to evidence of the shooting incident involving petitioner and his mother-in-law, Marjorie Scott.

Petitioner further contends that when such failings are viewed in conjunction with certain "weaknesses" in the prosecution's case—the lack of a murder weapon, the absence of an eyewitness who would testify as to Carolyn Grayson's murder, the bias and inconsistent recollections of Marlow Jones and Barbara Jones, the inconsistent recollections of eight-year-old Sauda Smith, and the nature of the evidence connecting petitioner to the murder of Janet Benner—the cumulative effect of defense counsel's errors requires that we vacate the judgment in its entirety.

Respondent contends that any deficiencies in defense counsel's performance either were based upon trial tactics or were not of constitutional dimension, and that even in the absence of defense counsel's errors, petitioner would have been found guilty. Respondent also disputes petitioner's efforts to portray this as a "close" case, one in which defense counsel's errors might have tipped the scales against petitioner, and instead contends that the evidence that was untainted by defense counsel's questionable trial tactics was of a compelling nature. In support of its position, respondent emphasizes that the prosecution introduced uncontested evidence that petitioner was observed attacking Carolyn Grayson with a tire iron a few weeks before she was fatally shot, petitioner and his family engaged in a plot to fatally poison Grayson, petitioner confided to his brother that he had to kill Grayson or she would send him to the gas chamber, petitioner informed his brother of the need to establish an alibi for the evening that Grayson was murdered, and Grayson's daughter, Sauda, testified that, on the night of Grayson's death, Grayson told her daughter that she was going out with petitioner.

In the course of his findings rendered at the conclusion of the evidentiary hearing, the referee opined: "*I think this was a horribly tried case.*" (Italics added.) We agree. In our view, the numerous deficiencies in defense counsel's performance, considered in the aggregate, were sufficiently significant to undermine our confidence in the outcome of the guilt phase of the trial.

In reaching this conclusion, we agree with petitioner's contention that the prosecution's case against petitioner for the murder of Carolyn Grayson was not overwhelming. Without a murder weapon or an eyewitness who would testify to the circumstances surrounding the murder of Carolyn Grayson, the only physical evidence connecting petitioner to the killing was Grayson's

keys (that fit petitioner's vehicle) recovered from the crime scene. (See *People* v. *Ledesma, supra,* 43 Cal.3d 171, 226 [a case "must be considered close" where no eyewitness or physical evidence links the defendant to the crimes].) (The nature of Grayson's relationship with petitioner suggests it is not remarkable that she would possess her own set of keys to his vehicle.) The only evidence directly indicating that Grayson spent her final evening with petitioner was the ambiguous recollection of Grayson's eight-year-old daughter, Sauda, who initially told the police on December 23, 1981, that her mother had *not* informed her of her travel plans, but testified at trial that Grayson told her that she (Grayson) was departing with petitioner on the night she was murdered. The prosecution's witnesses who testified regarding petitioner's motive to kill Grayson—Marlow Jones and Barbara Jones—each admitted harboring a strong bias against petitioner and provided varying accounts in their own testimony. Evidence also was presented that petitioner's *mother* and *sister* had *themselves* attempted to kill Grayson, and that petitioner's *wife,* Tanya, had expressed a willingness to kill Grayson, but that petitioner would not allow her to do so.

In view of the circumstance that the prosecution did not have an overwhelmingly strong case, defense counsel's inadequate pretrial investigation must be considered significant. Defense counsel's failing in this regard precluded the defense from effectively handling the prior shooting incident involving Marjorie Scott. Because defense counsel failed to investigate fully petitioner's involvement in the handgun-related shooting of Scott, the defense was ill-prepared to seek the exclusion of this evidence or to obtain available evidence that Scott, not petitioner, had brandished the firearm. Indeed, it is not difficult to conceive that, in the hands of competent counsel, a more balanced portrayal of the incident than that presented at trial could have been used to bolster the defense case that petitioner was a nonviolent individual who would risk his life to break up an altercation among his family members. As a result of defense counsel's deficient performance as to this issue, however, the jury heard uncontroverted, highly prejudicial testimony that, in order to settle a dispute, petitioner discharged a loaded firearm pointed at the face of his mother-in-law, from point-blank range. (See *People* v. *Thompson, supra,* 27 Cal.3d 303, 314 [admission of evidence that involves crimes other than that for which a defendant is being tried has a " 'highly inflammatory and prejudicial effect' " upon the trier of fact]; see also *People* v. *Sam* (1969) 71 Cal.2d 194, 206 [77 Cal.Rptr. 804, 454 P.2d 700] [admission of evidence of the defendant's prior criminal acts injected prejudice into the trial by making the defendant "appear to be an antisocial individual of generally bad character, an immoral person unworthy of the jury's belief or consideration"].) This testimony reinforced the prosecution's effort to portray petitioner as someone who was familiar with deadly weapons and resorted to gunplay when provoked.

Moreover, the basis for defense counsel's decision not to seek the pretrial exclusion of the shooting incident involving Scott (and presumably for failing to investigate the matter adequately)—"*the more things that come in the better*" (italics added)—clearly was unreasonable, and suggested that defense counsel's "tactical" decisionmaking was grossly flawed by an unwillingness or inability to distinguish between evidence that was innocuous or potentially beneficial, and that which was highly prejudicial. When trial tactics are motivated by such a fundamental misunderstanding of defense counsel's proper role at trial, the likelihood that a defendant received constitutionally deficient representation obviously is dramatically increased.

Although respondent correctly contends that Scott did testify that the shooting was "an accident," and was somewhat unclear regarding petitioner's role in the incident, perhaps lessening the impact of the testimony, it is conceivable that Scott's vagueness as to the details of the incident left the jury with the impression that petitioner had been armed with a loaded handgun and, at close range, deliberately had discharged the firearm at his mother-in-law. In his closing argument, the prosecutor exploited the vagueness in Scott's testimony to emphasize petitioner's propensity for violence and his lack of credibility: "[L]adies and gentlemen, consider what [petitioner] told you when I asked him the question about possessing a gun. 'Isn't it true that you shot this lady, Marjorie Scott?' [¶] 'No, never shot Marjorie Scott.' [¶] Yet Marjorie Scott comes to the stand, testifies about something different, but when I asked her, 'Were you shot?' [¶] 'Yeah.' [¶] 'Who was it?' [¶] 'Troy Jones.' [¶] She said it was an accident, but Troy Jones, when he testified, never alluded to anything about an accident with regard to the shooting of Marjorie Scott." As noted above, reasonable investigation would have produced evidence that it was *Scott* who had brandished the firearm and that petitioner had attempted to disarm her. Thus, defense counsel's deficient performance as to this issue clearly was significant.

The record also clearly establishes that defense counsel was unfamiliar with the details of the incident involving petitioner's armed confrontation with Frisco, even though such details readily would have been available to him prior to trial, had defense counsel followed up on petitioner's explanation as to the whereabouts of the Model 40 and obtained a copy of the Fresno police report. Defense counsel therefore was unable to use the police report to his client's advantage. Because defense counsel inadequately had investigated this incident, he was ill prepared to prevent the prosecution from using the evidence to impeach petitioner's testimony and to underscore petitioner's propensity toward violence.

The hearsay testimony given by Sauda Smith, on cross-examination, also bolstered the prosecution's case. The prosecution, in order to prove that

petitioner had killed Carolyn Grayson, sought to establish a compelling motive for the crime—petitioner's fear that Grayson might implicate him in the murder of Janet Benner. The testimony of Sauda, that her mother had informed her that "Troy killed Janet," obviously suggested—in a fashion potentially devastating to the defense—that petitioner had murdered Benner and that Grayson knew of his involvement in the crime.

Also of significance is defense counsel's failure to object properly to Marlow Jones's testimony, given at the preliminary hearing and introduced by the prosecution in its rebuttal case. Although, as noted earlier, in this proceeding we do not reach the issue whether the trial court erred in not sustaining defense counsel's objection to the introduction of this testimony on the ground that the prosecution had not established Marlow's unavailability, once the trial court found Marlow unavailable, defense counsel had the responsibility to interpose any other valid objection to the admission of the testimony, specifically one based upon the circumstance that Marlow's testimony at the preliminary hearing (that Emanuel Corners told him "I helped him carry the bitch in the field," and "I should have threw the gun in the lake instead of the pond") had been admitted at the preliminary hearing against Corners only. Defense counsel failed to object on the basis of Evidence Code section 1291, and did not argue that petitioner had lacked the opportunity to cross-examine Marlow meaningfully at the preliminary hearing in view of the circumstance that Marlow's testimony was admitted against Corners only. Had defense counsel not been deficient in this regard, potent testimony implicating petitioner in Carolyn Grayson's murder could have been excluded.

In view of the noted shortcomings, we agree with petitioner that defense counsel's deficient performance had a harmful impact upon these proceedings. In order to ascertain whether defense counsel's failings were prejudicial under *Strickland*, however, we must determine whether "the justice of [the guilt phase judgment] was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." (*Strickland* v. *Washington, supra,* 466 U.S. at p. 700 [80 L.Ed.2d at p. 702].) With this standard in mind, we conclude that, taking into account the nature and extent of defense counsel's inadequate performance, and the evidentiary weaknesses in the prosecution's case described above, there exists a reasonable probability that the outcome of the guilt phase would have been different but for the cumulative impact of defense counsel's numerous failings.

In reaching this conclusion, we observe that several of counsel's errors and omissions involved critical issues in the case. Because the evidence

revealed that a number of persons had demonstrated a willingness to kill Grayson, it was important for the prosecution to prove that petitioner in the past had used handguns of the type used to murder her. Defense counsel made this task easier by failing to seek exclusion of the shooting incident involving petitioner and Marjorie Scott, and failing to seek exclusion of the evidence of petitioner's armed confrontation with a cocaine dealer. Because there was no eyewitness testimony related to the commission of the crime, it was important for the prosecution to establish petitioner's motive. Defense counsel also made this task of the prosecution easier by eliciting testimony from Grayson's daughter that Grayson had told her that petitioner had killed Benner, and by making no attempt to locate Linda Henderson, who could have testified that Grayson had identified someone other than petitioner as Benner's killer. The lack of eyewitness testimony also increased the importance of the preliminary hearing testimony of Marlow Jones relating Corners's extrajudicial statement implicating petitioner in the killing of Grayson, and defense counsel again proved himself inadequate in his unsuccessful attempt to seek exclusion of that former testimony. Although, as noted above, there was evidence suggesting petitioner's guilt, this evidence was not overwhelming and there also was evidence that other members of petitioner's family had attempted to kill Grayson. Accordingly, we conclude that the cumulative effect of the ineffective assistance provided by defense counsel was prejudicial under the *Strickland* standard, and on that basis the judgment must be vacated in its entirety.

## DISPOSITION

Having determined that petitioner has met his burden of establishing that defense counsel's performance prior to and during the guilt phase of the proceedings was deficient and prejudicial under the applicable *Strickland* standard (*Strickland* v. *Washington, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698]), we conclude that petitioner was deprived of the effective assistance of counsel guaranteed by the federal and state Constitutions. Accordingly, petitioner's initial petition for writ of habeas corpus is granted, and the judgment of the Merced County Superior Court in People v. Troy Lee Jones, No. 11015, is vacated in its entirety. Upon finality of this opinion, the Clerk of the Supreme Court shall remit a certified copy of this opinion and order to the Merced County Superior Court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (a)(2). (See *In re Sixto, supra,* 48 Cal.3d 1247, 1265.)

The People remain free to retry petitioner for the crimes at issue.[9]

Mosk, J., Kennard, J., Werdegar, J., Chin, J., Lillie, J.,* and Lucas, J.,† concurred.

---

[9]Pursuant to Business and Professions Code section 6086.7, we are required to report our reversal of the judgment on the ground of ineffectiveness of counsel to the State Bar of California for investigation of the appropriateness of initiating disciplinary action against Attorney Hugh Wesley Goodwin. (*In re Sixto, supra,* 48 Cal.3d 1247, 1265, fn. 3.) Although the trial in this matter was conducted prior to the effective date of this statute, "no problem of retroactivity is presented, since that section is a legislative directive to the courts." (*People* v. *Shelley* (1984) 156 Cal.App.3d 521, 533, fn. 1 [202 Cal.Rptr. 874].) Because the statute is presently in effect, we follow its mandate. (*Ibid.*)

*Presiding Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Retired Chief Justice of the Supreme Court, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.