Filed 1/10/14  P. v. Melgar CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DAVID ALEXANDER MELGAR,<br><br>        Defendant and Appellant. | B244551<br><br>(Los Angeles County<br>Super. Ct. No. SA080901) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Antonio Barreto, Jr., Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

Defendant David Alexander Melgar appeals from the judgment entered following a jury trial in which he was convicted of misdemeanor attempted false imprisonment as a lesser included offense of attempted kidnapping.  Defendant contends the trial court erred by admitting evidence of an uncharged act against a separate victim and failing to give a limiting instruction, sua sponte, regarding that evidence.  He further contends that his trial attorney rendered ineffective assistance by failing to request such a limiting instruction.  We affirm.

## BACKGROUND

### 1.      Testimony concerning the charged offense

The charged offense of attempted kidnapping occurred about 5:00 a.m. on May 27, 2012, just outside a Trader Joe's store on the south side of Pico Boulevard in Santa Monica.  (Date references pertain to 2012.)  About 4:20 a.m., defendant walked west along the sidewalk on the south side of Pico, passing about four feet from Trader Joe's employee Eric Lutz, who was assisting in truck deliveries at the store.  Defendant looked at Lutz, but did not say anything to him.  Defendant was walking normally, not staggering.  About 4:50 a.m., Lutz saw defendant walking back in the other direction along the same sidewalk.  Defendant again said nothing to Lutz.  Abigayle Dunphy arrived at Trader Joe's for work about 5:00 a.m.  Defendant walked in front of Dunphy's car as she pulled into the Trader Joe's parking lot, causing her to stop and wait for defendant to cross in front of her.  He was not staggering and did not attempt to speak to Dunphy.  Another Trader Joe's employee, Catherine Daly, saw defendant standing in the Trader Joe's parking lot near the store when she arrived a few minutes before 5:00 a.m.  She described defendant as swaying or rocking slightly from side to side.  Daly passed within eight to ten feet of defendant, but he did not say anything to her.

Vivian George testified that she arrived to work at Trader Joe's about 4:15 or 4:20 a.m. on May 27.  After checking in and getting her gear, she began setting up the merchandise in the flower section, which was located in a tent outside the store entrance.  The tent had lighting inside.  Most of the other employees were on the opposite side of

2

the building, receiving merchandise deliveries. George suddenly noticed defendant standing three to five feet from her right side. Defendant asked in a low voice if he could use the phone inside. He stared at George in a manner she described as "leering." His leering stare caused George to feel very uncomfortable. George told him he was not allowed to go in the store, which was closed, that "this area was off limits, and that he needed to leave." Defendant said he needed to use the phone and said, "'I'm lost.'" George responded, "'This area is restricted and you're not allowed in the store. We are closed.'" She told defendant to leave, then backed into the store and locked the entry doors. George testified that defendant swayed while speaking to her and his eyes looked glassy, but he was not slurring his words. She thought he might be under the influence of something, but she did not smell an odor of alcohol coming from defendant at any time.

George looked through the entry doors and saw defendant leaving. A few minutes later, she went back outside to resume her work in the tent. As she was bent over working with the flowers, she felt two arms come around her from behind. One arm was over her face and the other on her mid- or lower torso, "wrapping" her. The arm over her face covered her mouth and she was gasping and unable to scream. She then felt herself twice "being yanked off the ground" and pulled backward, away from the store and toward the parking lot behind the flower tent. She estimated she was pulled a distance of about three to four feet. A police officer who subsequently responded and interviewed George measured the length as three feet.

George struggled and managed to free one of her arms, then jabbed her assailant with her elbow. As a result, she freed herself from his grasp and was able to run into the store, screaming. She looked back and saw that defendant was the person who had grabbed and dragged her. Defendant ran toward the parking lot, possibly toward Pico in a "crouched run."

One of George's coworkers phoned 911. George got on the phone and described her assailant. The police arrived at the store within a few minutes, at 5:10 a.m. A

3

responding officer noticed that George's knees were skinned and one of her fingers was bleeding. George surmised she must have fallen while running.

One of the responding police officers drove around the area and observed defendant, who matched the description George provided, jogging east along the south side of Pico near Centinela at 5:14 a.m. The officer called for backup, pulled his car near defendant, and ordered defendant to stop. The officer did not notice defendant staggering or displaying any "symptoms of being highly intoxicated." Other officers brought George, Lutz, Dunphy, and Daly, separately, to the location for a field show-up. Each of them identified defendant. Defendant was arrested and transported to the Santa Monica Police Department. The officer who transported him testified that he noticed a slight odor of alcohol emanating from defendant's breath, defendant's speech was slightly slurred, and his eyes were red and watery, but defendant did not require assistance walking.

## 2. Testimony concerning events leading up to the charged offense

Defendant and his aunt, Jessica Marquez, testified for the defense. On the night of May 26, defendant, Marquez, their cousin Aaron (also known as Edwin), Jessica Munoz, David Morales, and sisters Diana R. and Sophia R. went to The Vault, an over-21 nightclub in downtown Los Angeles. Before traveling to the club, the group met at Diana's house. (Prosecution rebuttal witnesses Morales and Diana testified the group met at Morales's house.) Defendant did not know anyone in the group except Aaron and Marquez. Diana and Sophia testified they had not met defendant prior to that night. At the house, some members of the group began drinking vodka with or without pineapple juice. Marquez testified defendant had four or five "very strong" drinks. Defendant testified he had two or three "kind of strong" drinks with a little juice in them. Morales testified that defendant had two vodka drinks at the house. Defendant also testified he smoked marijuana before going to the club that night. Morales did not drink because he was driving the group to the club in his friend's van. Diana testified she did not have anything to drink at the house.

4

Defendant, who was 20, gave the bouncer about $100 to let him into the club. Inside the club, the group had "bottle service" and received two bottles of vodka, one bottle of champagne, and a bucket of beers. Marquez and Morales saw defendant drinking inside the club. Defendant testified that he drank two or three beers and an unknown number of vodka and juice cocktails at the club; he was drinking the entire time they were there. Marquez testified that Diana drank a lot at the club and passed out. Morales and Diana testified that Diana had two drinks at the club, vomited on Morales, then just rested on the couch with Morales, without having anything else to drink. Morales was the only man Diana had danced or interacted with at the club. Marquez testified that Sophia had about eight drinks at the club and was dancing and "making out" with defendant.

The club closed at 2:00 a.m. and the group left. Marquez testified that defendant appeared to be intoxicated because he was squinting and had a goofy smile, which was how he appeared on other occasions when Marquez had seen him drinking. Diana testified that Sophia was very intoxicated and had to be helped to the van. Most of the group members were hungry and they decided to go to a Norm's restaurant located at Pico and Sepulveda.

Defendant testified that the alcohol he consumed affected his memory of the evening. He remembered dancing with girls and exploring the club's other dance floor upstairs. He remembered getting back into the van and "making out" with Sophia in the van. He then fell asleep and did not awaken until the group got to a restaurant. Sophia testified that defendant was consensually touching her breasts in the van, but she became nauseous and said she was going to be sick. Morales pulled over and Sophia got out of the van and vomited. She then got into another car in which Aaron was riding. Defendant moved to the third row of seats, sat between Marquez and Munoz, and put his head in the lap of one of them.

Diana testified that when they were in the van, she was tired, but sober. She gave Morales directions to get to the 10 freeway. Once the van was on the freeway, Diana

5

leaned against the side of the van and closed her eyes. After two or three minutes, she felt defendant's hand on her breast. The contact was "skin to skin." She grabbed his hand, turned, and saw defendant, who was sitting behind her, close to the back of her seat. She asked, "'What are you doing?'" Defendant replied "that he just wanted to know what was up." Diana pushed defendant away and told him to leave her alone. Defendant appeared to understand what Diana was saying and he was not slurring his words.

About 30 seconds later, defendant reached both arms around Diana's seat and tried to grab her breasts. Diana grabbed each of defendant's hands. She moved defendant's left hand down and angrily "banged" his right hand against the inside door of the van. For the rest of the ride to Norm's, Diana pinned defendant's right arm against the side of the van to prevent him from touching her again. After everyone else got out of the van at Norm's, Diana turned to face defendant. She "cuss[ed] him out," asked him why he had acted that way, and told him it was inappropriate. Defendant appeared to understand what Diana was saying and said he did not understand why she was overreacting. Diana opined that defendant was sober.

When Diana got out of the van, Morales was standing by and asked her what was wrong. Diana said "nothing," but Morales knew she was upset. Morales asked defendant if he was going to go in the restaurant or stay in the van, and he said he would stay. At that time, defendant was sitting upright and seemed to understand what Morales was saying. After Diana and Morales entered the restaurant, Diana described to Morales what had happened in the van. After defendant was arrested, Aaron discouraged Diana from calling the police because defendant was "in enough trouble," given the charged offense.

Marquez testified that she did not see defendant touch Diana in the van, see Diana grab defendant's hand, or hear Diana say anything to defendant in the van, although Diana was talking to others in the van. When they arrived at Norm's, Marquez attempted to wake defendant, but he grunted and said he was sleepy, so they left him in the van and went inside to eat. When they came out of the restaurant after eating, Morales unlocked

6

the van and they discovered that defendant was gone and had left his phone in the van. They drove around the area looking for him, but could not find him.

Defendant testified that he stayed in the van at the restaurant because he was sleepy and "really drunk," he felt like he did not belong with the rest of the group because they were older and more sober than he was, and he was embarrassed. He testified that he did not remember Diana saying anything to him, but he told Detective Maury Sumlin that he "got mad" because one of his cousin's friends told him something. On cross-examination at trial he testified he remembered that someone—he thought it was Diana—was angry at him and told him something when he was the only one in the car, but he "didn't think it was towards" him.

Defendant testified he got out of the van and began walking west on Pico. When he saw a Taco Bell he realized he was near his friend Leroy Leon's apartment on Cloverfield, so he decided to go there. At some point during his journey to Leroy's, defendant vomited. Defendant jogged or "power walk[ed]" to Leroy's apartment and knocked on a window he thought was in Leroy's bedroom, but was actually in Leroy's parents' bedroom. Leroy's mother spoke to him in Spanish through the window. He responded in Spanish, telling her he was looking for Leroy and that he was drunk and lost. She went to get Leroy. Defendant went to the front door but did not wait there very long before he decided no one was coming out and began walking back toward the restaurant along Cloverfield, then along Pico.

Defendant testified he saw George working outside a store. He went up to her because he wanted to try to phone someone, probably his mother, to come pick him up "or get directions or something." Using a pay phone or a phone at Leroy's apartment never occurred to defendant. Defendant said, "'Excuse me. Can I use a phone? I'm lost.'" George looked up, "like spooked." She told him he could not be there and the store was not open yet. Defendant asked again, and George told him the same thing again. Defendant looked away, and when he looked back, George was already back

7

inside the store, so he went back to Pico and continued to power-walk or jog eastward along Pico toward the restaurant and his group.

Defendant denied he grabbed or pulled George or tried to kidnap her. He would "never" try to do something like that because he respected women "a lot." Defendant testified that he was both "[a] little" intoxicated when he was speaking to George and "really drunk" when he noticed the police car coming up behind him as he jogged or power-walked down Pico after leaving Trader Joe's.

Leroy Leon testified he was defendant's best friend. Leon's apartment was on Cloverfield, near Pico, about two blocks from Trader Joe's. He and defendant had been drinking together every other weekend since they were in ninth grade. When defendant was extremely drunk he would talk a lot, sometimes slurring his speech, but he did not stagger. Leon had seen defendant do dumb things when he was intoxicated, but he had never seen defendant behave aggressively toward women, whether defendant was sober, slightly intoxicated, or extremely intoxicated.

Leon's mother, Miriam Caballero, testified that about 4:00 or 4:30 a.m. on May 27, defendant knocked on her bedroom window and said he wanted to see Leroy. Defendant looked a little upset, but he did not tell Caballero that he was lost or ask to use a phone. Leroy's father told Leroy that defendant was looking for him, and Caballero opened the front door, but defendant was not there. Leroy attempted to phone defendant but no one answered.

Detective Sumlin testified that the distance between the Norm's restaurant to Leroy Leon's apartment and back to Trader Joe's was 3.1 miles. It took Sumlin 1 hour 17 minutes to walk that route. There were six pay phones along this route and at least one of them had a dial tone when Sumlin tested it in September 2012. Near Trader Joe's was a doughnut store that was open at 4:30 a.m. There was a Travelodge one block west of Trader Joe's on Pico and a McDonalds three blocks west on Pico that were also open at that time. Defendant had $149.52 when he was booked.

8

**3.      Verdict and sentence**

The jury acquitted defendant of attempted kidnapping and convicted him of attempted false imprisonment, a misdemeanor, as a lesser included offense. The court sentenced defendant to 180 days in jail, with credit for 226 days.

## DISCUSSION

**1.      Admission of defendant's conduct toward Diana**

**a.      Defendant placed his conduct toward Diana in issue**

In defense counsel's opening statement, she told the jury that George's version of the incident "seems also a little bit implausible." She explained that George was "tiny, and [defendant's] bigger." She continued, "If [defendant] really wanted to take her somewhere he could have. And to do what? There is no—to do what? Where is he taking her? What's he doing it for? So it doesn't make sense. [¶] He said to her, 'Can I please use the phone? I'm lost.' This is a person that just freaked out."

The next day of trial, defense counsel complained she had just been given a report of six new witnesses and some photographs. The prosecutor informed the court that, based upon defense counsel's opening statement, Sumlin had interviewed additional people who had been with defendant on the night of May 26 and morning of May 27, and the prosecutor wanted to call some of them to counter the defense that counsel had indicated she was using. The court rejected defense counsel's complaints that this was late discovery. When the court returned to the issue at the end of the day, defense counsel again argued the information was late discovery, but the court again rejected that argument.

Defense counsel added, "then, this is coming in, then, as a form of an 1109 or 1108 evidence, and the defense is entitled to notice of it. I mean, I think that this is 352 of the Evidence Code. I think it's not relevant. I think it is improper for the trial." Counsel added that there were "within it statements that . . . are improper." In the course of further discussion, defense counsel stated she intended to call Marquez, and defense

9

counsel agreed with the court that her principal objection was to Diana "saying that [defendant] groped her twice inside the van."

The court ruled that the evidence regarding defendant's conduct toward Diana could not be introduced "affirmatively" by the prosecutor, but could be used as impeachment of defense witnesses or rebuttal. The court explained that because Marquez was with defendant at the nightclub and in the van, if she testified, "she can be asked about everything that happened that night," including "everything he said, everything he did, how much [*sic*] he acted, how much he drank." The court declined to "limit the cross-examination of Jessica [Marquez] because now Diana says that these things happened in the van." The court suggested the defense might want to reconsider whether it wanted to call Marquez as a witness. The court explained: "[I]t's one thing for the People to bring in this evidence affirmatively. That's what the objection's about. It is a completely different thing to bring it in as rebuttal evidence, or as impeachment evidence of defense witnesses. And I don't want anybody thinking that a ruling in one way is a ruling that lasts forever no matter what anybody gets up there and says."

The court further warned that defendant could be impeached with the Diana incident if he chose to testify. Defense counsel claimed the Diana incident was irrelevant, but the court explained, "[T]here has to be a motive for the kidnap."

Counsel argued that the Diana evidence was prejudicial. The court explained, "The question is whether it's substantially more prejudicial than probative. And if he is trying to, with a stranger apparently in the van, trying to grab her breast, being upbraided for it by a girl who doesn't like his sexual attentions and she tells him off, and then later on he disappears and appears to grab a woman who is a total stranger and appears to be trying to drag her off to an area of isolation and darkness, I think it is highly probative of why he's trying to do it."

Defense counsel argued that defendant was not charged with kidnapping for rape. The court responded that the prosecutor was allowed to establish motive and had to show specific intent to prove attempted kidnapping, and the Diana incident was relevant to

10

both.  The court warned defense counsel that calling Marquez or defendant to testify would allow the prosecution to use the Diana incident for impeachment if Marquez or defendant denied that the Diana incident occurred or claimed not to remember it.

Defendant called Marquez as a witness.  On cross-examination, the prosecutor asked Marquez if she saw defendant reach around the seat and touch Diana's breast, saw Diana grab defendant's hand, or heard Diana say anything to defendant.  Marquez said she had not seen or heard these things.

Defendant testified in his own defense.  The prosecutor cross-examined defendant about the Diana incident, and defendant testified he had no memory of it, but later said he remembered that someone—he thought it was Diana—was angry at him and told him something when he was the only one in the van.

On rebuttal, the prosecutor called Morales and Diana to testify about the Diana incident.  Defendant contends the evidence of the Diana incident was inadmissible character evidence and should have been excluded pursuant to Evidence Code sections 1101 and 352.  (Undesignated statutory references are to the Evidence Code.)  He argues the incidents were unconnected and dissimilar, the prejudicial impact of the evidence outweighed its probative value, and its introduction unduly consumed time and created a "'mini-trial.'"

The Attorney General contends defendant forfeited part of his appellate claim by failing to specifically object on the ground of section 1101 in the trial court.  Although defense counsel did not specifically mention section 1101 as a basis for exclusion, we do not deem the claim forfeited because it is clear from the lengthy discussion between the court and counsel that the court understood that defense counsel was objecting to the evidence as inadmissible character evidence.  Defense counsel even mentioned sections 1108 and 1109, which provide exceptions to the rule of exclusion set forth in section 1101, subdivision (a).  No valid purpose would be served by deeming the appellate claim forfeited.

11

**b.** **Standard of prejudice**

The court's erroneous admission of evidence only requires reversal if it is reasonably probable defendant would have obtained a more favorable outcome had the evidence been excluded. (§ 353, subd. (b); *People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

**c.** **Admission of the challenged evidence was harmless**

We need not determine whether the trial court erred by admitting evidence of the Diana incident because any possible error was harmless. The jury rejected both the charged offense of attempted kidnapping and the more serious lesser included offense of false imprisonment by force or violence, and instead convicted defendant of misdemeanor false imprisonment. This verdict demonstrates that the jury did not use evidence of the Diana incident to infer that defendant was predisposed to commit a crime, which is the principal risk of introducing evidence of prior misconduct. (*People v. Guerrero* (1976) 16 Cal.3d 719, 724.)

In addition, George's testimony regarding defendant's conduct was strong and was contradicted only by defendant's denial. Whereas defendant had an obvious bias in the case, George had none.

The jury was able to reach the verdict on misdemeanor false imprisonment without any consideration of the Diana incident. It could have disbelieved defendant's testimony that he was just trying to use a telephone because he did not wait until his friend Leroy Leon came to the door of his apartment to be admitted to make a phone call. He did not tell Leroy's mother that he wished to make a phone call. He passed other open businesses where he might have found a telephone, as well as passing six pay telephones.

The jury also could have disbelieved his testimony that he was lost. He had been at Leroy Leon's apartment just before the incident, and walked from there. The jury may have concluded that he knew where his best friend's apartment was, and was not lost.

He had sufficient money in his possession to use a pay phone to telephone a taxi, which he could pay to take him home.

12

The jury's verdict shows that it believed George, but was not persuaded by the Diana incident that defendant had a common motive and intended to kidnap George to achieve that motive. As the Attorney General argues, "the jury's *verdict* shows that [defendant] already achieved the best realistic result obtainable in this case."

## 2.    Failure to give limiting instruction sua sponte

Defendant contends that the trial court erred by failing to instruct with CALCRIM No. 375 regarding the limited admissibility of the evidence of the Diana incident.

CALCRIM No. 375 provides, in pertinent part, "The People presented evidence (of other behavior by the defendant that was not charged in this case/that the defendant *<insert description of alleged conduct admitted under* Evid. Code, § 1101(b)>). [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the (uncharged offense[s]/act[s]). Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the (uncharged offense[s]/act[s]), you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] *<Select specific grounds of relevance and delete all other options.>* [¶] . . . [¶] *<B. Intent>* [¶] [The defendant acted with the intent to *<insert specific intent required to prove the offense[s] alleged>* in this case](./; or) [¶] *<C. Motive>* [¶] [The defendant had a motive to commit the offense[s] alleged in this case](./; or) [¶] . . . [¶] *<H. Other Purpose>* [¶] [The defendant *<insert description of other permissible purpose; see* Evid. Code, § 1101(b)>.] [¶] [In evaluating this evidence, consider the similarity or lack of similarity between the uncharged (offense[s]/ [and] act[s]) and the charged offense[s].] [¶] Do not consider this evidence for any other purpose [except for the limited purpose of *<insert other permitted purpose, e.g., determining the defendant's credibility>*]. [¶] [Do not conclude from this evidence that the defendant has a bad character or is disposed to

13

commit crime.]  [¶]  If you conclude that the defendant committed the (uncharged offense[s]/ act[s]), that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of *<insert charge[s]>* [or that the *<insert allegation[s]>* has been proved].  The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt."

The California Supreme Court has "consistently held that where, as here, a defendant fails to request an instruction, a trial court 'generally [has] no duty to instruct on the limited admissibility of evidence.  [Citation.]'" (*People v. Valdez* (2012) 55 Cal.4th 82, 139 (*Valdez*) [no sua sponte duty to give limiting instruction regarding witnesses' fear of testifying]; see also *People v. Riccardi* (2012) 54 Cal.4th 758, 824 ["Generally speaking, absent a request, the trial court has no duty to give an instruction limiting the purpose for which evidence may be considered."].)

Defendant relies upon language in *People v. Collie* (1981) 30 Cal.3d 43 (*Collie*), in which the Supreme Court concluded that the trial court had no duty to instruct sua sponte on the limited admissibility of evidence of past criminal conduct, but postulated a limited hypothetical exception to the general rule:  "Neither precedent nor policy favors a rule that would saddle the trial court with the duty either to interrupt the testimony *sua sponte* to admonish the jury whenever a witness implicates the defendant in another offense, or to review the entire record at trial's end in search of such testimony.  There may be an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.  In such a setting, the evidence might be so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant from his counsel's inadvertence.  But we hold that in this case, and in general, the trial court is under no duty to instruct *sua sponte* on the limited admissibility of evidence of past criminal conduct."  (*Id.* at p. 64.)

This is not the extraordinary case hypothesized in *Collie*.  As the court stated in *Valdez*, *supra*, 55 Cal.4th at page 139, "Defendant's reliance on *Collie* fails because the

14

evidence of the witnesses' fear was more than minimally relevant to a legitimate purpose—supporting the witnesses' credibility—and was not 'a dominant part of the evidence against' defendant. [Citation.] Therefore, the trial court did not err in failing to instruct, sua sponte, on the evidence's limited admissibility."

Even if defendant had requested a limiting instruction, we would conclude that the absence of a limiting instruction was not prejudicial for the same reasons that any error in admitting evidence of the Diana incident. The chief purpose of a limiting instruction is to prevent the jury from inferring that the defendant is predisposed to commit crimes, and the jury's rejection of both the charged offense of attempted kidnapping and the more serious lesser included offense of false imprisonment by force or violence demonstrates that the jury did not draw a propensity inference from that evidence.

### 3. Ineffective assistance of counsel

Defendant contends that his attorney rendered ineffective assistance by failing to request a limiting instruction regarding evidence of the Diana incident.

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, the defendant would have obtained a more favorable result. (*In re Jones* (1996) 13 Cal.4th 552, 561.)

For the same reasons that the admission of the evidence and the failure to give a limiting instruction was harmless, we conclude that there is no reasonable probability that, but for counsel's failure to request such an instruction, defendant would have obtained a more favorable result.

15

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.

MILLER, J.*

We concur:

ROTHSCHILD, Acting P. J.

CHANEY, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16