Filed 6/4/21  P. v. Thompson CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058655 |
| v. | (Super. Ct. No. 18NF0020) |
| GARY ALBERT THOMPSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed.

Benjamin Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Deputy Attorney General, for Plaintiff and Respondent.

\*          \*          \*

A jury found Gary Albert Thompson guilty of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count 1),[1] two counts of criminal threats (§ 422, subd. (a); counts 2 & 5), robbery (§§ 211, 212.5, subd. (c); count 3), brandishing an imitation firearm (§ 417.4; count 4), criminal threats and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 6). In connection with count 5, the jury found it to be true that defendant used a dangerous weapon; to wit, a BB gun. The court found true that defendant had suffered a prior strike. Defendant was sentenced to a total term of imprisonment of 13 years 4 months.

The evidence shows that when defendant's ex-girlfriend claimed she had lost certain jewelry defendant previously gave her, he accused her of lying, waited for her at her apartment, brandished a fake firearm, slammed her against the wall, and began to choke her. When a good Samaritan tried to stop him, he brandished the fake firearm and threatened her.

On appeal, defendant contends the prosecutor engaged in misconduct. At trial, defendant testified, offering a far-fetched take on what happened on the day in question. During closing argument, the prosecutor implied that to find defendant not guilty, they would have to believe defendant's fanciful tale and disbelieve the prosecution witnesses whose testimony was well corroborated. Defendant contends this improperly shifted the burden of proof to him.

We conclude defendant waived the argument by failing to object at trial. Defendant contends that the lack of objection constituted ineffective assistance of counsel. We disagree and affirm the judgment.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

**FACTS**

*1. Prosecution evidence*

T.S. began dating defendant after they met online in February 2016. They were in a relationship for approximately one year and eight months until T.S. ended it in November of 2017. After the breakup, they talked about getting back together but Defendant said he did not want to; T.S. had mixed feelings.

Approximately two or three weeks after they decided not to get back together, Defendant contacted T.S. and asked her to return some jewelry he had given her. She had moved and cleaned her apartment; and could not find the jewelry. Defendant was angry and did not believe her.

On December 4, 2017, Defendant and T.S. exchanged text messages arguing over the jewelry. Defendant said, "I just want the shit I gave you because that shit was paid off by sleepless nights and that was paid to show you how much I cared about you, but now I see I wasn't appreciated and I am still not appreciated." "The earrings [were] $500 themselves together. Man, I am going to fuck somebody up if that shit don't turn up." T.S. interpreted this to mean defendant might show up at any time and hurt someone, possibly her. She was scared. T.S. said she might have accidentally thrown the jewelry away and defendant said, "[Y]ou're fucking lying your ass off." I will fuck the shit out of you if it don't come up." "I am going out there and take everybody's shit out of the house. That's because you are lying." T.S. said she would call the police and defendant replied, "Find my shit. I don't care if you call the police. That will be the one thing you'll regret, on my dead uncle's grave. Bring that shit out of the trash." T.S. called the police and showed them the text messages. On December 8, 2017 defendant sent a text that said, "I'm coming out there tomorrow, so you better have an army of patrol police cars out there, because I am going to bust some shit up." T.S. again called police.

T.S. lived about half a block from a bus stop and usually called her mother as she walked from the bus stop, up the stairs to her apartment. After the text messages from defendant, she altered her usual path home and began texting friends so that someone always knew where she was.

T.S. did not have any contact with defendant until December 29, 2017. On that day, she got home from work at about 6:00 or 6:30 p.m. and called her mother as she walked from the bus stop to her apartment building and up the stairs.

As she was going up the stairs, she saw defendant out of the corner of her eye and said, "Oh, shit." Defendant said, "I just want to talk." T.S. told defendant to "leave [her] alone," then exited the stairwell on the second floor, even though she lived on the third floor. After she left the stairwell, T.S. yelled at defendant, "Go away and leave me alone. You are not supposed to be here."

T.S.'s mother testified T.S. said over the phone, while crying, "Mom, call the police. He's here." Her mother asked, "Who is here?" T.S. replied "Garry." She then heard T.S. say, "Let me go. Leave me alone. Stop. Stop. Stop." Defendant said, "I told you I would get you, bitch."

A.D., a neighbor, came out of her apartment after hearing screaming and a bump against her wall. A.D. and T.S. had seen each other around the building, but were not actually acquainted. T.S. told A.D., "He is not supposed to be here. He needs to leave me alone." A.D. tried to talk to defendant and told him, "See, she don't want you here. Just go. Why are you here? Just leave her alone."

Defendant walked back toward A.D. and said, "It's none of your business. Mind your business." A.D. testified that she invited T.S. into her apartment, but T.S. did not respond. As T.S. backed away, defendant pulled out a gun, pressed it against A.D., and repeated, "Mind your own fucking business." Defendant began to walk away but A.D. said, "Leave her alone." Defendant returned, put the gun to A.D.'s head, and said "You don't know me." Meanwhile, T.S. had rounded the corner into another hallway.

4

Defendant walked away and A.D. called 911. A.D. was so scared by the incident that she moved out of her apartment.

T.S. continued walking away and rounded a corner. When defendant caught up to T.S., she saw him holding a gun with a red laser sight. T.S. ran but defendant grabbed her arm and shoved her against a wall. She began to scream. He put his left hand around her neck, squeezed, and said, "You want to make a scene? This is what a scene looks like. I told you I was going to fuck shit up." Defendant's hand was on her neck for 30 to 45 seconds. It was painful and T.S. had trouble breathing, but she did not lose consciousness. Defendant grabbed her phone and ran. T.S. went into a different apartment and called 911.

T.S.'s mother was still on the phone and heard defendant running away with T.S.'s cell phone. She yelled, "Garry Thompson, we will get your ass." She heard defendant say, "Oh, shit," and hang up.

At about 9:30 p.m., police found defendant sitting in his parked car in Los Angeles. Under the cover for the spare tire compartment, an officer found the replica handgun defendant had used in the assault. The officer believed it to be a real handgun when he first found it, but the officer later determined it was a BB gun. The gun did not have an orange tip that sometimes distinguishes fake handguns. BBs were in the trunk. More BBs, a .22 caliber bullet, and T.S.'s cell phone were found in defendant's pocket.

The parties stipulated defendant had been convicted of a felony.

*2. Defense evidence*

Defendant testified that he dated T.S. from February 2016 to March of 2017. They were apart from March until October 8, 2017, while defendant was incarcerated. They discussed getting back together, but defendant chose not to, which upset T.S.

Defendant had given T.S. approximately $4,200 worth of jewelry to hold for him while he was incarcerated. He denied that it was a gift. Defendant sent T.S. text

5

messages about returning the jewelry, but she said she lost it. On December 29, 2017, T.S. told defendant that she found the jewelry, and he should come over when she got off work around 6:00 p.m. When defendant arrived, he saw T.S. walking into the building talking on the phone and followed her in. She exited the stairwell on the second floor, which defendant found strange. She said into the phone, "He's here, he finally showed up." She was backing up and would not explain what was going on. He said, "I just want to talk to you." She pushed him and said, Leave me alone." He said, "I just came to get my jewelry."

A.D. came out of her apartment and said, "What's going on?" Defendant said, "Mind your business." He was angry and raised his voice but did not use a replica firearm. A.D. and T.S. were friends.

T.S. pushed defendant and he grabbed her hand. He said, "Why [are] you pushing me? Why are you trying to fight?" He denied strangling her or saying, "I'm going to fuck you up."

Defendant left and returned to his car. T.S. followed him, sat in the car, and apologized to him.

On cross-examination, defendant denied that the BB gun was his. Defendant was not sure why the BB gun was in his trunk, but surmised that relatives may have had it in a backpack, the gun may have fallen out, then fallen into the spare tire compartment, which, though covered, does not have a latch. When confronted with one of his text messages that suggested the jewelry was a gift to T.S., he claimed it was a typo. He testified that T.S.'s cell phone must have fallen out of her pocket when she apologized to him in his car and that is how he ended up with her cell phone.

3. *Closing Argument*

During her rebuttal closing argument, the prosecutor made the following argument, which forms the basis of this appeal.

6

"So I've made a list of everything you need to ignore and you need to believe in order to find the defendant not guilty. Okay? So we're going to go over that real quick.

"You need to believe [A.D.] is lying about everything.

"You need to believe [T.S.] is lying about everything.

"You need to believe that the defendant, the only one with a motive to lie, is the only one telling the truth.

"You need to believe that [A.D.] and [T.S.] knew each other."

"You need to believe that [T.S.] invited the defendant over on the 29th after receiving threatening text messages from him and after calling the police on him.

"You need to ignore the fact that she was screaming. Those screams were heard by her mother over the phone and later by [A.D.] in the hallway.

"And you also need to remember that not only did [A.D.] hear voices, she heard a thud against her apartment wall as well.

"And then you need to believe that [T.S.] acted crazy and just went crazy on the defendant for no reason after she invited him over.

"You need to ignore the fact that the testimony of [A.D.] and [T.S.] is consistent with each other regarding what happened in front of [A.D.]'s door.

"You need to believe that the defendant did not remove the gun from his waistband and press that gun against [A.D.]'s chest with his finger on the trigger and [told] her to mind her fucking business.

"You need to believe that he did not point a gun at her face or head from a couple of feet away, again, telling her to mind her fucking business, with his finger on the trigger.

"You need to ignore that [A.D.] saw the defendant walk toward [T.S.] holding the gun in his hand.

"And then you need to ignore that [T.S.] then saw the defendant coming back around the corner from [A.D.], putting a gun in his waistband.

"You need to ignore the fact that [A.D.] called 911.

"You need to ignore that both [A.D.] and [T.S.] provided the same description of the gun.

"You need to ignore that the defendant chased and grabbed [T.S.] by her arm, spun her around, and pinned her against the wall. That's what she told you, that's what she told Officer Valdes, and that's what she told Detective Greene.

"You need to believe that he never touched [T.S].

"You need to ignore that [T.S.] testified she was strangled, told Officer Valdes she was strangled, and told Detective Greene she was strangled.

"You need to believe that the defendant never threatened [T.S.] that he was going to, quote, fuck her up as he strangled her, even though that's what she told Officer Valdes happened right after the incident.

"You need to believe that the defendant did not grab [T.S.]'s phone out of her hand as he strangled her and ignore her testimony that he did.

"You need to ignore the testimony of her mother, that she heard screams, a scuffle, and then the sound of running.

"And you also need to ignore when her mother testified that she yelled at the defendant through the phone and he replied, 'Oh, shit,' before disconnecting the call.

"You need to believe that her mother is a liar.

"You need to believe that [T.S.] followed the defendant out to the parking lot where his imaginary friend was.

"You need to believe she got into the car with him and that she dropped her phone inside the car.

"You need to ignore the fact that [T.S.]'s phone was found in the pocket of defendant's pants.

8

"You need to believe he didn't take a gun to the apartment.

"You need to ignore the fact that [A.D.] and [T.S.] both provide the same description of the gun that matches the description of the gun that is found three hours later in the trunk of his car.

"You need to believe the gun was not his.

"You need to believe he did not know there was a gun in the trunk of his car.

"You need to believe that it must have been—and I couldn't remember if he said it was his cousin's or his friend's—must have been in his cousin's or friend's backpack . . . and it must have somehow fallen underneath the panel that covers the spare tire or must have fallen there when the police were going through the trunk of the car.

"You need to believe that the cousin of friend or true owner of the BB gun never asked the defendant about it, never said, 'Hey, I think I lost my gun in your trunk.' And he said that was on a trip to the beach; so you need to believe they were going to the beach in December.

"You need to ignore that there were BB's for the gun in the trunk, that there were BB's for the gun in the pocket of the defendant's pants.

"So in order to find the defendant not guilty, you need to ignore and believe those things.

"And like I said before, I will say it again, his story is completely unreasonable and inconsistent with the facts and the evidence in this case, and if you follow CALCRIM 224, it will tell you what you do with what is unreasonable. You disregard it.

"At the end of the day, this case comes down to two questions: Do you believe [A.D.] or the defendant?  Do you believe [T.S.] or the defendant? It is as simple as that. Okay?"

9

Defense counsel did not object at any point during this portion of the argument.

Defendant appealed from the judgment.

**DISCUSSION**

Defendant contends the judgment should be reversed because the prosecutor committed misconduct. Specifically, he contends the argument quoted above had the effect of shifting the burden of proof to him. The People deny any misconduct and contend defendant waived the misconduct argument by failing to object at trial.

We agree defendant waived the prosecutorial misconduct claim because defense counsel failed to object. (*People v. Jackson* (2016) 1 Cal.5th 269, 367 ["A defendant's 'failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective'"].) Defendant seeks to avoid the waiver in three ways.

First, defendant contends that an admonishment would have been ineffective. However, he cites nothing in the record to support that contention and based on our own independent review of the record, we find nothing to suggest an admonition would have been ineffective.

Second, defendant cites the principle that we have discretion to consider issues on appeal that were not properly preserved. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6.) We decline to exercise that discretion here because, in our view, any improper implication regarding the burden of proof could easily have been remedied with an admonition.

Finally, defendant claims that if the objection were waived, which it was, then he received ineffective assistance of counsel. "A claim of ineffective assistance of counsel has two components: '"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

10

Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.""'"  (*In re Vargas* (2000) 83 Cal.App.4th 1125, 1132.)

"Our review of counsel's performance is a deferential one.  [Citation.]  'It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  [Citation.]  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." [Citation.]'  [Citation.]  'However, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified.  '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions."'  [Citations.]  'Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance.'"  (*In re Jones* (1996) 13 Cal.4th 552, 561-562.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.  [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'"  (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

11

Balancing those competing considerations here, we conclude there was no ineffective assistance of counsel. While we recognize that the prosecutor's arguments bore implications for the burden of proof that were potentially problematic—in particular, the notion that the jury must disbelieve defendant's testimony in order to find him not guilty—we do not view the prosecutor's comments primarily in that light. In our view, the prosecutor's argument was primarily a commentary on the quality of the evidence. The gist of the argument was that the People's evidence was abundant and well corroborated, whereas defendant's testimony was self-serving and far-fetched. That was plainly a proper argument to make.

The question, therefore, is whether defense counsel was required to object to a problematic implication from an otherwise proper argument. We conclude defense counsel was not. A defense attorney is not required to raise every possible objection at trial. In proper cases, a defense attorney "could reasonably have determined that the risks of raising the objection and offending or annoying the jury outweighed whatever benefit might have been obtained from prosecutorial remarks that were little likely to prejudice his client." (*People v. Welch* (1999) 20 Cal.4th 701, 754.)

Here, the jury had been repeatedly told that the burden of proof was on the People. The court properly instructed the jury on the burden of proof at the outset of the trial, immediately before the prosecutor's opening statement, and after the close of evidence. The prosecutor reminded the jury during closing argument that "it is my burden in this case," and during her rebuttal argument, immediately prior to the alleged misconduct, stated, "I am in no way shifting the burden of proof because, again, the burden of proof is fully on me." Defense counsel had likewise referred to the burden on the prosecution.

The jury was further instructed that its verdict must be based only on the law provided by the court—even if it conflicts with what the attorneys said—and the

12

evidence presented during the trial, and that statements made by counsel during their opening and closing arguments are not evidence.

In this context, where the prosecutor's remarks were not directed at the burden of proof, and the jury had been repeatedly reminded that the burden rested on the prosecution, it was within defense counsel's reasonable discretion to determine that the benefit of an objection to a potentially problematic implication was outweighed by the risk of annoying the jury. Defense counsel's performance in failing to object, therefore, was not deficient. Thus, there was no ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.