Filed 11/20/25  P. v. Westrope CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD LYNN WESTROPE,<br><br>    Defendant and Appellant. | D086609<br><br><br>(Super. Ct. No. INF1801566) |

APPEAL from a judgment of the Superior Court of Riverside County, Anthony R. Villalobos, Judge.  Affirmed.

James M. Crawford, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Richard Lynn Westrope seeks reversal of his convictions for continuous sexual abuse of and lewd acts on a child under the age of 14. Westrope contends:  (1) there was insufficient evidence to establish sexual intent for his lewd act convictions; and (2) he received ineffective assistance

of counsel related to a witness called by defense counsel at trial. We find no error and affirm the judgment.

## BACKGROUND

The People charged Westrope with continuous sexual abuse of Jane Doe, a child under the age of 14 years (Pen. Code,[1] § 288.5 [count one]), lewd and lascivious acts upon Jane Doe, a child under the age of 14 years (§ 288, subd. (a) [counts two and three]), and willful and unlawful annoying and molesting Jane Doe (§ 647.6 [count four]). The information additionally alleged three aggravating factors.

At trial, the jury heard the following evidence.

A. *Continuous Sexual Abuse*

Westrope was married to Jane Doe's grandmother. Starting when Jane Doe was around five years old,[2] Westrope would put his hands in her pants and massage her vagina over her underwear while she sat on his lap. This happened around 15 to 20 times and stopped when Jane Doe was 11 years old.

In December 2018, Jane Doe told her brother Dylan and stepsister Paige that Westrope used to put his fingers on Jane Doe's vagina. Dylan or Paige told Jane Doe's stepmother what she said. A few days later, Jane Doe told her father that Westrope had been touching her vagina under her skirt, over her underwear, "all [her] life."

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Jane Doe was born in July 2006.

2

B.    *Lewd and Lascivious Acts*

On June 5, 2018, 11-year-old Jane Doe was alone with Westrope at his house.  He asked her to sit on his lap, unbuttoned her shirt, lifted her bra, and licked and kissed her breasts.  Then, he started to pull down her skirt, but she stopped him.

In July 2018, Jane Doe had a birthday pool party.  Westrope told Jane Doe he was leaving soon and to come say goodbye.  Jane Doe complied, and then Westrope pulled up on strings attached to the side of her swimsuit, exposing her buttock.  Jane Doe's friend Sophia, who was 11 years old at that time, felt uncomfortable seeing this inappropriate act.  After that incident, while still at the pool party, Sophia commented privately to Jane Doe, "What the heck?  That was weird."  Jane Doe responded that Westrope had done something else weird.  She explained to Sophia that he had lifted her bra, kissed her breast area, and tried to pull down her pants.  Sophia insisted Jane Doe tell her stepmother what happened, which Jane Doe did.  Then, while still at the party, Jane Doe told her father that, about six weeks before, Westrope unbuttoned her shirt, exposed her breasts, kissed her breasts, and tried to remove her skirt.

Paige was also at that birthday party.  That day, Westrope touched Paige's buttocks, making her uncomfortable.  Later, when Paige commented to Jane Doe about Westrope's action, Jane Doe responded that Westrope touched her own vagina and buttocks somewhat frequently.

In cross-examining the prosecution's witnesses, including Sophia, Paige, Jane Doe, Jane Doe's father, and the investigator, defense counsel frequently brought up a "game" where "adults blow on the stomach and someone makes fart noises."  He also questioned the defense witness about this "game," as discussed below.  Counsel raised the "game" in his closing

3

argument to contend that Westrope lacked the sexual intent required of the charged offenses.

C.     *The Pretext Call*

The jury also heard about a pretextual telephone call made by Jane Doe to Westrope as part of the ensuing sexual assault investigation.  The sheriff's department arranged to have Jane Doe call Westrope to discuss the incidents.  The conversation was recorded and transcribed.  The jury heard:

> Jane Doe:  Hey Papa, I just wanted to know if you were gonna be at the house, um, this week when grandma comes . . . to study with me.
>
> Westrope:  Well . . .  I certainly can be, if you want me to.
>
> Jane Doe:  Well, that's the thing, I don't really want you to, 'cause I feel awkward, since you picked me up in June, um, from school, and you took . . .
>
> Westrope:  Yeah.
>
> Jane Doe:   . . . took off my shirt.
>
> Westrope:  Yeah.
>
> Jane Doe:  It makes me feel really awkward when I see you.
>
> Westrope:  Okay.  I won't come by.
>
> Jane Doe:  Okay.
>
> Westrope:  Is that all?
>
> Jane Doe:  Um . . . yeah.  Oh yeah, but also, um why— why did you do that?
>
> Westrope:  [Inaudible] I was just playing around, honey.
>
> Jane Do:  But—
>
> Westrope:  Didn't mean anything by it.
>
> Jane Doe:  Papa, that wasn't playing around, that was . . .

4

Westrope:  Okay.

Jane Doe:  . . . you . . . abusing me.

Westrope:  Well, I'll tell you what, honey, it will never, ever happen again.

Jane Doe:  Okay.

Westrope:  I promise you that.

Jane Doe:  Okay.

Westrope:  Okay?  Is that all?

Jane Doe:  Um . . . let me think . . .

[¶] . . . [¶]

Westrope:  . . .  Alright, baby, well, listen . . . it's never gonna happen again.

Jane Doe:  Well, but Papa, why did you do it?

Westrope:  Well, honey, I'm just—

Jane Doe:  Why'd you kiss my boobs?

Westrope:  I don't know, just— I was just playing around.  I didn't mean anything by it.

Jane Doe:  But—

Westrope:  I don't ever wanna hurt you.  I don't ever wanna do anything that you don't want me to do.  I told you that before.

Jane Doe:  But Papa—

Westrope:  Right?

Jane Doe:  I told you to stop, and you didn't stop.

Westrope:  And I did, didn't I?

Jane Doe:  After  . . .

5

Westrope:  I did, didn't I?

Jane Doe:  . . . awhile.  After I had to get you to stop.

Westrope:  Okay.  I'm— I'm very, very sorry, honey.  And it won't ever happen again.

Jane Doe:  But you p— you tried to pull down . . .

Westrope:  What—

Jane Doe:  . . . my underwear and do all this stuff, and it's not okay.  It makes me feel really awkward.  Especially when you went to my birthday party.  It was awkward seeing you there.

Westrope:  Oh.  So, you just don't want me to come over anymore?

Jane Doe:  That's not what I'm saying.  It's just awkward, since you did that.

Westrope:  Okay.

Jane Doe:  And it's weird to see you there.

Westrope:  Okay, honey, then I'll tell you what I'll do . . . is I won't— we'll— we'll shake hands and maybe a hug, and that's about it.  That's all.  There's no more touching.  No more fooling around.  Uh, and . . . if you don't want me to come over for awhile, just say, "Papa, I don't want you to come over for awhile."  I understand.  I did not mean to hurt your feelings.  I did not mean to, um, [inaudible] make you feel uncomfortable.  So . . . um . . .  and, again, that's all I can do is just say, yep, I won't do it again, and I apologize.

D.    *The Defense Expert*

At trial, the defense called one witness, Dr. Veronica Thomas, a clinical and forensic psychologist with a specialty in sexual behavior and sexual deviance.  She performed a psychological assessment on Westrope "to provide

6

a thorough objective history of his functioning." The assessment included an evaluation of Westrope's sexual behavior and interests.

Defense counsel asked Dr. Thomas whether Westrope was a danger to his community. The prosecution objected as to relevance. At sidebar, defense counsel explained that the question is relevant to Westrope's "profile" and as "one of the things that she discussed and found out and made a conclusion about." Westrope's dangerousness was "circumstantial evidence of the whole thing," according to the defense. The prosecutor argued dangerousness was a sentencing issue that was intended at trial to appeal to the jury's sympathies. The trial court permitted the questioning. Dr. Thomas then testified her "finding was that at the time of assessment there was minimal indication that he was a danger of risk or harm to the community."

Dr. Thomas additionally testified the testing "reveal[ed] that he has [sexual] interests in school-aged [female] children," ages six to thirteen, which is "not common." While not a common interest, she further explained, "sexual interest in children" can be "part of . . . overall normal sexual adult functioning." She continued that having a sexual interest does not mean the person will act on it.

Defense counsel then asked if there are "circumstance[s] where contact behavior is misinterpreted," and Dr. Thomas answered affirmatively. Counsel inquired whether "an older gentleman . . . making fart noises on some child's chest or abdomen, would . . . suggest to you that that is a categorical problem with sexual deviance?" Dr. Thomas responded, "In and of itself, no. Parents are known to engage in that kind of loving contact. But . . . [it] depend[s] upon the age, developmental level of both parties and the context . . . ." Counsel followed up by asking whether Dr. Thomas's evaluation uncovered sexual intent in the context of Westrope's conduct with

7

Jane Doe. Dr. Thomas answered: "[H]e had explained to me the circumstances of the behavior as loving and caring conduct and that it was not about sexual interest." Dr. Thomas further stated, during testing, ". . . . He was very emotional and upset about the nature of the charges. It was his family and somebody that he loves very much." He was in "shock and disbelief" about the charges.

E.     *Verdict and Sentencing*

The jury found Westrope guilty on counts one, two, and three. The jury did not reach a verdict on count four, which the People dismissed. After a subsequent bench trial, the court found the three aggravating factors true beyond a reasonable doubt. The court imposed a sentence of 14 years, composed of 12 years on count one (the middle term), a consecutive two years on count two (one-third of the middle term), and a concurrent two years on count three (one-third of the middle term).

## DISCUSSION

Westrope contends: (1) there was insufficient evidence of sexual intent to support the convictions of lewd or lascivious acts; and (2) trial counsel provided ineffective assistance by calling Dr. Thomas and eliciting testimony from her that Westrope had sexual interest in children ages six to thirteen. We disagree with these contentions.

A.     *Lewd and Lascivious Intent*

A conviction under section 288, subdivision (a) requires that the defendant: (1) committed a lewd or lascivious act, (2) with sexual intent. (*People v. Martinez* (1995) 11 Cal.4th 434, 442 (*Martinez*).) Westrope argues the record lacks sufficient evidence of sexual intent for both section 288, subdivision (a) convictions. We disagree.

8

When a defendant challenges the sufficiency of the evidence supporting a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) We presume " ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Ibid.*) The trier of fact's determination of the defendant's intent involves an examination of all circumstances, including "the manner of touching" and "other acts of lewd conduct admitted or charged in the case." (*Martinez, supra*, 11 Cal.4th at p. 445.)

Here, there was evidence Westrope licked and kissed Jane Doe's breasts and tried to pull down Jane Doe's skirt. During the pretext call, Jane Doe asked why Westrope kissed her breasts, and rather than deny he did so, Westrope responded, "I don't know, just was playing around." On many other occasions, he touched her vagina. This evidence was sufficient for a reasonable jury to infer that for the conduct charged in counts two and three Westrope had the "intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself" or Jane Doe. (§ 288, subd. (a); CALCRIM No. 1110.) An adult does not innocently or playfully lick and kiss a female child's breasts and then try to pull down her skirt, especially one who previously touched that child's vagina on multiple occasions. (See *In re R.C.* (2011) 196 Cal.App.4th 741, 750–751 ["The manner of the touching itself—the intentional French kissing of a child under 14 by an adult—and the absence of any conceivable innocent explanation are dispositive."; "there

9

can be no innocent or lovingly affectionate tongue kissing of a child by an adult"].)

B.    *Ineffective Assistance of Counsel*

Westrope next contends his counsel was ineffective for calling Dr. Thomas as a witness, eliciting testimony that Westrope had sexual interest in children ages six to thirteen, and failing to move to exclude that testimony.

Constitutionally ineffective assistance of counsel exists when: (1) counsel performed deficiently; and (2) the deficient performance caused prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*).)

1.    *Deficient Performance*

Deficient performance occurs when the "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  (*Strickland, supra*, 466 U.S. at pp. 687–688.)  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  (*Id.* at p. 690.)  The reviewing "court defers to counsel's reasonable tactical decisions," but counsel's performance is deficient if "the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission" or if "there simply could be no satisfactory explanation."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  "Whether to call certain witnesses is . . . a matter of trial tactics . . . ."  (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

a.    *Calling and Questioning Dr. Thomas*

We conclude defense counsel's calling Dr. Thomas and questioning her about Westrope's sexual interest did not fall below the standard of reasonableness.  There was strong evidence of Westrope's guilt from Jane Doe

10

and her family's consistent testimony about the events and Westrope's adoptive admissions during the pretext call. Given the strong evidence of guilt, defense counsel's tactical decision to call Dr. Thomas to testify could be seen as an "attempt[ ] to make the best of a bad situation, given his very limited options." (*In re Alcox* (2006) 137 Cal.App.4th 657, 669.)

Dr. Thomas provided testimony favorable to Westrope and supportive of the defense theory that he was merely playing around with Jane Doe, when there otherwise would have been none. Dr. Thomas explained that contact behavior might be misinterpreted. Counsel asked her about an adult making "fart noises on some child's chest or abdomen," which he had repeatedly raised during cross-examination of other witnesses. Dr. Thomas answered that such parents are "known to engage in" such "loving contact," and Westrope told her his actions were loving and caring, not about sexual interest. She stated he was in shock over the charges. While she testified he showed a sexual interest in children ages six to thirteen as part of her assessment, she explained he otherwise had a normal profile. She mitigated the negative testimony by explaining that having a sexual interest does not mean a person will act on that interest. Over the prosecution's objection out of concern for eliciting sympathy from the jury for Westrope, Dr. Thomas also stated that Westrope posed little risk of harm to the community.

Westrope's reliance on *In re Jones* (1996) 13 Cal.4th 552 does not affect our conclusion that defense counsel acted within the bounds of reasonable performance. In that case, the defendant was accused of murdering his girlfriend because she knew about a prior murder he committed. (*Id.* at p. 559.) At trial, defense counsel asked the victim's child whether she remembered her conversation with her mother about the defendant and what that conversation entailed. (*Id.* at p. 568.) The witness responded her

11

mother told her that the defendant killed the other individual. (*Ibid.*) On habeas review, the court concluded that defense counsel acted deficiently because counsel failed to interview the witness prior to trial to learn the answer to the question about the previous homicide. However, defense counsel should have been aware of the daughter's answer because it was in a police report, and counsel asked the witness particularly about the defendant. (*Id.* at pp. 570–571.) Unlike in that case, the testimony defense counsel elicited in this case did not involve acts by Westrope related to the crime charged but instead focused on psychological testing.

Nor does Westrope's reliance on *Buck v. Davis* (2017) 580 U.S. 100 assist him. In that case, the United States Supreme Court concluded that defense counsel's performance at the sentencing hearing was deficient because his expert witness unconstitutionally testified that the defendant had an increased likelihood of dangerousness due to his race. (*Id.* at pp. 118–119.) Nothing remotely like the expert witness conduct in *Buck* occurred in the instant matter.

### b. *Failing to Exclude Portions of Dr. Thomas's Testimony*

Next, Westrope argues trial counsel's performance was deficient in failing to move to exclude as an improper opinion about guilt Dr. Thomas's testimony about Westrope's sexual interests in younger females. (See *People v. Clotfelter* (2021) 65 Cal.App.5th 30.) In *Clotfelter*, the expert testified that the defendant had sexual interest in the alleged victims as part of his relationship with them. (*Id.* at p. 57 [" '[M]y opinion with *reasonable medical certainty* is that Mr. Clotfelter *continues to experience sexual interest in prepubescent boys* and that he seeks relationships that will facilitate this type of contact . . . *the relationships he developed with Steven and [E.H. and B.H.] are such examples . . . .*' "].) Here, *Clotfelter* is inapposite because Dr. Thomas

12

offered no similar testimony. Instead, Dr. Thomas merely testified as to the results of her assessment, including a general psychological profile of Westrope; Dr. Thomas did not share with the jury opinions regarding any particular acts committed by Westrope or his relationship with Jane Doe. Rather, Dr. Thomas repeated Westrope's denial of having sexual interest in Jane Doe.

2.    *Prejudice*

Deficient performance by counsel causes prejudice when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

Even if counsel's performance was deficient, it is not reasonably probable that the result of the trial would have been different without Dr. Thomas's testimony that Westrope showed sexual interest in children ages six to thirteen. Westrope made little attempt in his briefing to contend otherwise. Jane Doe provided evidence that Westrope touched her vagina on many occasions and that, on one occasion, he kissed her breasts and tried to pull down her skirt. When she confronted Westrope during the pretext call about him kissing her breasts and abusing her, he said he did not know why he did it, he was just playing around, he was sorry, and it would never happen again. He did not deny her accusations. Because the jury heard evidence that Westrope engaged in this inherently sexual conduct with Jane Doe specifically, it was not reasonably probable that the result would have been different without Dr. Thomas's general testimony on Westrope's sexual interests.

13

## DISPOSITION

The judgment is affirmed.


RUBIN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.